THE UNITED STATES, APPELLANTS, *v.* DAVID M. HUGHES, ROBERT SEWALL, AND FRANKLIN HUDSON, A MINOR, BY HIS TUTOR, HOLMES HUTCHINSON.

Where a person entered land according to law, but omitted to obtain a patent for it, and another person afterwards obtained a patent from the United States by proceeding as if it were vacant land, knowing at the same time that it was not vacant, the patent thus obtained will be set aside.

Nor is it a sufficient objection to a decree, that the process was by an information in the nature of a bill in chancery, filed by the attorney for the United States. A simple bill in equity would have been better, but this process being so in substance, the case will not be dismissed for want of form.

An individual owner of land would, in such a case, be entitled to the relief of having the patent set aside; and the United States, as a landholder, must be entitled to the same.

The deeds of conveyance filed as exhibits show the property to have been sold for two thousand dollars, and that it was afterwards converted into a sugar estate. This is sufficient to maintain the jurisdiction of this court.

THIS was an appeal from the Circuit Court of the United States for the District of Louisiana.

The attorney of the United States filed an information in the nature of a bill in chancery against David M. Hughes, who was the real defendant, and also against Sewall and Hudson, nominal defendants.

On the 12th of April, 1814, Congress passed an act (3 Stat. at Large, 122) for the final adjustment of land titles in the State of Louisiana and Territory of Missouri.

The fifth section was as follows:—

" Sec. 5. And be it further enacted, That every person, and the legal representatives of every person, who has actually inhabited and cultivated a tract of land lying in that part of the State of Louisiana which composed the late Territory of Orleans, or in the Territory of Missouri, which tract is not rightfully claimed by any other person, and who shall not have

removed from said State or Territory, shall be entitled to the right of preëmption in the purchase thereof, under the same restrictions, conditions, provisions, and regulations, in every respect, as is directed by the act entitled 'An Act giving the right of preëmption in the purchase of lands to certain settlers in the Illinois Territory.' passed February 5, 1813." (See 2 Stat. at Large, 797.)

This act of 1813 prescribed the mode of proceeding; that the party should make known his claim to the register, &c., &c.

Prior to or on the 22d of February, 1822, one John Goodbee presented the following application to the register and receiver of the Eastern District of Louisiana.

"Gentlemen, — I apply to become the purchaser of a tract of land by virtue of settlement under the act of Congress of the 12th of April, 1814, situated as follows, in the parish of Iberville, principally on the north side of the Bayou Goula, designated as No. one by the surveyor, and is the same land which was inhabited and cultivated by Daniel Beedle, or Bidelle, in the year 1813, under whose settlement I claim by purchase. This land belongs to the United States, and is not rightfully claimed by any other person; neither has said Bidelle removed from the State. The land claimed has not been surveyed according to law, but I apply for the right of preëmption to one hundred and sixty superficial acres, at the price provided by law, and offer proofs of the facts set forth.

"John Goodbee."

Whereupon the register and receiver issued the following certificate and receipt.

"No. 8.

"The applicant having proved, to the satisfaction of the register and receiver for the Eastern District of Louisiana, that he has a preëmption right to the land claimed, I, in consequence, certify that he is entitled to one hundred and sixty superficial acres of land, as applied for; subject, however, to the sectional or divisional lines to be hereafter run under the authority of the United States.

"Sam. H. Harper, *Register.*

"*February 22d, 1822.*"

"*Receiver's Office, New Orleans,
February 26th, 1822.*

"Received of John Goodbee two hundred dollars, being the purchase-money for one hundred and sixty superficial acres of land, in the parish of Iberville, designated as No. 1 by the sur-

veyor, to which he has a preëmption right, according to the certificate of the register, No. 8, exhibited to me.

"J. J. McLanahan, *Receiver.*

"160 acres à $1\frac{25}{100}$, $200. Original filed 9th Oct., 1845.

"Paul Deblieux, *Clerk.*"

Subsequently proper returns of survey were made, on which the land was fully described and designated as lot No. 1, on the north side of Bayou Goula, or section 54 in township 10 (west of the Mississippi) of range 12 east.

On the 14th of May, 1836, David Michael Hughes entered this land as if it were a tract of public land, containing $175\frac{46}{100}$ acres; and on the 16th of April, 1841, obtained a patent from the United States.

On the 3d of April, 1846, the receiver gave a certificate to John Goodbee, that he had received from him the sum of $19.32, the price of $15\frac{46}{100}$ acres at $1.25 per acre, that being the excess of the land beyond the original estimate and payment.

On the 20th of January, 1848, Thomas J. Durant, Attorney of the United States for the District of Louisiana, filed in the Circuit Court an information and bill, commencing as follows: —

"To the Honorable the Judges of the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, in Chancery sitting: Informing, showeth unto your honors, Thomas J. Durant," &c., &c.

The bill then went on to narrate the facts of the case as above set forth.

It further states, that on or about the 14th of May, 1836, Hughes, who resided near the town of Alexandria, Louisiana, did make an application to the register of the land-office of New Orleans, to enter and purchase the said lot of land at private sale, falsely representing to the register that the said land was then subject to entry and sale, and that he was by the said register permitted to enter the said land, as if the same was liable to private entry; and that he, still falsely representing the said land as subject to private entry and sale, did, on the same day, pay the receiver the sum of $219.32, and that there was issued to him by the register the usual certificate given in such cases. That, on the 16th of April, 1841, Hughes presented the said certificate to the Commissioner of the General Land-Office at Washington, still falsely representing the land as subject to private entry and sale, and that he had legally paid for the same, and did procure the commissioner to issue a patent to him. That all the acts and doings of the register

and receiver in permitting Hughes to enter and pay for the land were done in error, and were at the time, and now, null and void; and that the acts and doings of the Commissioner of the General Land-Office were also, then and now, null and void, because the land had long before been sold by the United States to John Goodbee, and that Hughes is bound, in equity and good faith, to restore and give up the patent, and not to pretend or set up any title to the said land.

That Goodbee is dead, and that the land is in the joint occupation and settlement of Robert Sewall, who resides on it, and of Franklin Hudson, a minor, who is represented by his tutor; and that they pretend to possess said land as owners, under title derived from Goodbee; and that the said parties in possession ought to be made parties to the proceedings in the case.

It is further stated, that, so soon as the error in issuing a patent and the other acts preparatory thereto were discovered, Hughes was requested to give up and restore the patent, and receive back the money he had erroneously paid for the land, but refused to do so; on the contrary, he had commenced suit in one of the State courts against the possessors, who hold under Goodbee, to deprive them of the land by means of said patent, to the damage and injury of the United States, who are bound in equity and good faith to hold harmless all persons who have derived title from Goodbee from the consequences of errors and mistakes of their own, and their officers, and particularly from those of the error in issuing a patent to Hughes.

The bill then charges combination and confederacy, and that Hughes had refused to comply with the requests made to him, and sets forth his pretences for so doing; and the defendant Hughes is required to answer the following interrogatories: Nos. 1, 2, 3, 4, 5, 6, 7, 8, and 10; and the other defendants Nos. 9 and 11.

1st. Whether the said land was not entered by David Michael Hughes at the land-office of the United States in New Orleans, on the 14th day of May, 1836?

2d. Whether, in making said entry, he, the said David Michael Hughes, did not represent said land to the register of the land-office as land that was then subject to entry and private sale?

3d. Whether, at the time of making said entry, he, the said David Michael Hughes, did not know that the said land had previously been sold by the United States to John Goodbee?

4th. Whether he, the said David Michael Hughes, did, on the 16th day of April, in the year 1841, obtain or procure a patent for said land from the General Land-Office in Washington?

5th. Whether said David Michael Hughes has, since the patent was procured by him, and before the institution of these

proceedings, been called upon to restore and give up said patent to the proper officer of the United States, on the ground that said patent was erroneously issued and delivered to him, and to receive back the money which he paid into the treasury as the price of said land?

6th. Whether the said David Michael Hughes has not refused to give up said patent when so called upon?

7th. Whether the said David Michael Hughes has not commenced, and is not now carrying on, proceedings at law in one of the State courts of Louisiana, to obtain possession of said land by virtue of said patent; and, if yea, in what court, and who are the parties defendant in said suit?

8th. Whether, at the time of his procuring said patent from Washington, he, the said David Michael Hughes, did not have information, or did not have reason to believe, that the said land had formerly been entered and paid for by John Goodbee?

9th. Whether the said John Goodbee is now alive; and, if not, when did he die?

10th. Whether the said David Michael Hughes did not know, or was not informed, when he entered said land, that the land was in possession of Robert Sewall and of Franklin Hudson; or did he not know or believe that it was in possession of some parties claiming it as owners, and of whom?

11th. In whose possession is said land now, and by what title do the present possessors hold it? Is said title derived from John Goodbee, and how?

The prayer of the bill was for an injunction to restrain Hughes from proceeding at law, upon the patent, to obtain possession of the land; and to restrain him from selling, disposing of, or parting with the same, during the pendency of this suit; and that he may be decreed to deliver up the patent to the United States to be cancelled, as having been issued to him in error, and without right, and for further and general relief.

Sewall and Hudson, the latter by his tutor, answered the bill, setting forth their title derived from Goodbee, praying to be dismissed from court and quieted in their title.

Hughes demurred, and for special causes of demurrer assigned:—

1st. That by the showing in said bill this court has no jurisdiction of the matter presented, as the subject of controversy between this defendant and Sewall and Hudson, being all citizens of Louisiana.

2d. Because, by the showing in said bill, the United States, as complainants, have no interest whatever in the matter in controversy.

3d. That the case made by the bill shows that Robert Sewall

and Franklin Hudson, who are defendants in this bill, are in point of interest the only proper parties to complain against this defendant, and are not properly his co-defendants.

4th. Because, by the case made by the bill, the United States appear to litigate the private rights of one citizen against another citizen, without cause or authority so to do.

5th. Because there is no law to authorize the United States to invoke the courts of the United States to repeal, revoke, and cancel a deed for land given by the United States to a citizen, when the whole price is acknowledged to have been received by the United States for the land sold.

6th. Because the complaint is in form an information by the district attorney of the United States in behalf of the United States, and in behalf of Sewall and Hudson, for matters only cognizable by a court of equity, on a bill in chancery, at the instance of the party aggrieved.

7th. Because the matter asserted as a preëmption right to land in John Goodbee is in law no right of preëmption.

8th. Because, if the right asserted was originally good as a right of preëmption in Goodbee, it is shown by the bill to have been lost, and forfeited as such right, for want of timely payment; and for many other defects, &c., in said bill appearing.

On the 24th of January, 1849, the court sustained the demurrer and dismissed the bill. The United States appealed to this court.

It was argued by *Mr. Crittenden* (Attorney-General), for the United States, and submitted on printed argument by *Mr. Henderson* for the appellees.

*Mr. Crittenden* made the following points : —

I. That the court has jurisdiction to vacate and cancel the patent issued to Hughes.

Coke, 4 Inst. 88, says, that the Chancellor has jurisdiction to hold plea of *scire facias* to repeal letters patent, and enumerates three cases in which the writ lies for that purpose. 1st. Where the same thing has been granted to different persons, the first patentee shall have the writ to repeal the second patent. 2d. Where a grant has been made upon a false suggestion. 3d. Where a thing has been granted, which by law cannot be granted.

Where any thing has been unadvisedly granted which ought not to be granted, the remedy to repeal is by *scire facias* in chancery. This may be brought either on the part of the king, or, if the grant is injurious to a subject, the king is bound of right to permit him to use his name for repealing the patent in a *scire facias*. 3 Bl. Com. 261; 2 Ib. 346, 348; The Prince's

47 *

Case, 8 Co. Rep. 20; The King *v.* Butler, in the House of Lords, 3 Levinz, 220; Cumming *v.* Forrester, 2 Jac. & Walk. 342; Gledstanes *v.* Earl of Sandwich, 4 Man. & Grang. 1029; Brewster *v.* Weld, 6 Mod. 229.

In Attorney-General *v.* Vernon, 1 Vernon, 281, 282, and same case, Ibid. 387 – 392, it was held that a bill in chancery lies to set aside a grant of land. This was a case of purchase.

That a bill lies is also decided in Jackson *v.* Lawton, 10 Johns. 25; Jackson *v.* Hart, 12 Johns. 77; Seward's Lessee *v.* Hicks, 1 Har. & McHen. 23, which moreover is a bill by individuals. Lord Propietary *v.* Jenings, Ibid. 144; Norwood *v.* Attorney-General ex rel. Bowen, 2 Har. & McHen. 201, 213; Smith and Purviances *v.* Maryland ex rel. Yates, Ibid. 244, 252; Miller *v.* Twitty, 3 Dev. & Bat. 14; 1 Story's Eq. 121, 155, 157.

Mr. Wirt was of opinion, that patents for land issued by the United States might be repealed either by *scire facias* or bill. Opinions, 334. The case of Jackson *v.* Lawton, above cited, is to the same effect. But it may be a question whether a *scire facias* lies in such a case, there being no statute on the subject, and the patent not being a matter of record. However that may be, it is very clear, by the authorities above referred to, that a bill in chancery lies, which is the mode of proceeding adopted in this case. See also Polk's Lessee *v.* Wendell, 9 Cranch, 99.

II. That the patent issued to Hughes ought to be vacated and cancelled, the same having been issued in error, and without authority of law, and upon false representations and suggestions.

The purchase made by Hughes of lot No. 1 was by private entry. This entry was void, the land not having been previously offered at public sale. The fourth section of the act of 24th of April, 1820 (1 Land Laws, 224), is express on this point. The patent upon this void entry was therefore issued without authority of law, and void.

The evidence to sustain this point, that the land was not offered under the President's proclamation of the 11th of August, 1823, is to be found in the letter of the register of the land-office at New Orleans, of the 23d of February, 1846, exhibit C, of the bill. It will be remembered that the certificate to Goodbee, allowing the preëmption, is dated 22d February, 1822, and is signed by Samuel H. Harper, the register, and that the price was paid to the receiver on the 26th of the same month. Now the evidence is, " that on the tract book, under the President's proclamation of 11th August, 1823, lot No. 1, north side of Bayou Goula, is there registered in the order of sale, but opposite is written, in the handwriting of Samuel H. Harper, the then register, " sold." Mr. Harper had previously al-

lowed Goodbee's preëmption, and he therefore marked the lot as sold on the tract book, under the proclamation.

But even if the land had been offered at public sale, the private entry of Hughes was void, because the register and receiver had no authority to sell and receive the purchase-money of lands which had been already sold.    The lands authorized to be sold are the public lands of the United States. Act of 24th April, 1820, 1 Land Laws, 323.    The land in question had become the property of Goodbee, under the act of 1814, by the allowance of the preëmption claim by the register and receiver, whose decision by the terms of the act is conclusive : " And in every case where it shall appear to the satisfaction of the register and receiver, that any person who has delivered his notice of claim is entitled, according to the provisions of this act, to a preference in becoming the purchaser of a quarter-section of land, such person so entitled shall have a right to enter the same," &c.    See Wilcox v. Jackson, 13 Peters, 498.    The sale and patent to Hughes were, therefore, made and issued without authority of law, and void.

By the demurrer, Hughes admits the charge in the bill, that he represented the land to be liable to entry and sale.

III. That the land was subject to preëmption by Goodbee, and his claim thereto properly allowed.

It does not appear at what date Goodbee made his application, it having no date ; but it is certain his claim was allowed on the 22d of February, 1822, and that he paid the purchase-money on the 26th, for " one hundred and sixty superficial acres of land, in the parish of Iberville, designated as No. 1 by the surveyor, to which he has a preëmption right, according to the certificate of the register, No. 8, exhibited to me."    At the date of the payment, it is therefore clear that the lands had been surveyed.    In the following year all the lands in the township which had been surveyed were proclaimed for public sale by the President.

In order that the court may understand why the land was designated lot No. 1, it is necessary to state that, by the second section of the act of 3d March, 1811, the surveyors were "authorized, in arranging and dividing such of the public lands in the said Territory (Orleans), which are or may be authorized to be surveyed and divided, as are adjacent to any river, lake, creek, bayou, or watercourse, to vary the mode heretofore prescribed by law, so far as relates to the contents of the tracts, and to the angles and boundary lines, and to lay out the tracts, as far as practicable, of fifty-eight poles in front and four hundred and sixty-five poles in depth, of such shape and bounded by such lines as the nature of the country will render practi-

cable and most convenient," &c. (1 Land Laws, 190.) In the first surveys made in Louisiana, therefore, the public lands on watercourses were always laid out according to the mode above directed, which was the ancient French and Spanish mode, — a narrow front on a stream, and running back for quantity. The number of acres embraced within the area of the measures given is one hundred and sixty acres, or thereabouts. On the plats, these lots were numbered continuously, sometimes, where the watercourse was long, running through many townships. In the township in which the land in question is situated, they are numbered 1, 2, &c. on the north side of Bayou Goula; and 1, 2, &c. on the south side. In the proclamation of 1823, they are proclaimed as lots numbered in the same way, lying on the north and south sides of the bayou.

The General Land-Office has uniformly allowed preëmptions under the act of 1814, on the land thus surveyed; and in cases where, by the subsequent surveys of the adjacent lands, these lots have been found to contain more than one hundred and sixty acres, they have allowed the preëmptor to enter the additional number of acres. As having some bearing on this, see the first section of the act of 29th April, 1816 (1 Land Laws, 281), which seems to have been made to correct a construction of the land-office with respect to preëmptions under the acts of 1813 or 1814, to be found in 2 Land Laws, no. 220, 221. The other portions of the townships directed to be surveyed on the watercourses were surveyed in the usual manner, into sections of a mile square, and fractional sections, and these were connected with the watercourse surveys, the whole forming one connected plat. When this was done, the whole sections, fractional sections, and lots were numbered anew as sections, the lots, however, also retaining their original numbers. For instance, in this particular case, the land stands on the completed plat both as lot No. 1 and section 54. The survey of the township on which the land in question lies was not completed until 1830. When the surveys were completed, lot No. 1 was found to contain one hundred and seventy-five acres, and for the additional number of fifteen acres the parties who now hold under Goodbee paid the receiver on the 3d of April, 1846.

By the allowance of the preëmption, in 1822, Goodbee, as the representative of Beedle, acquired the land in question, and the United States parted with all their interest in it. In Carrol v. Safford, 3 Howard, 461, in speaking of the liability of lands, held by purchasers from the United States who had not received their patents, to State taxes upon them, the courts say, "Lands which have been sold by the United States can in

no sense be called the property of the United States.. They are no more the property of the United States than lands patented."

The land in question now forms part of a valuable sugar-plantation. It is respectfully submitted, that the decision of the court below ought to be reversed.

*Mr. Henderson* made the following points.

First Point. This case must be dismissed for want of jurisdiction, because the plaint is a libel or information by the District Attorney of the United States, filed in behalf of the United States, but not in the name of the United States, and filed in equity (not in admiralty). This in England, in behalf of the crown, might be proper. The " crown officer " proceeds officially and in his own name. Story, Eq. Pl. § 49 and § 8. But the United States have no such regal pretensions to be so represented.

" The judicial power shall extend to all cases in law and equity, . . . . . to controversies, to which the United States shall be a party." Const. U. S., art. 3, § 2. And by the Judiciary Act of 1789, § 11, the jurisdiction of the Circuit Court of the United States at common law, or in equity, shall only be invoked by the United States when the value in dispute is equal to $500 or more, and they are " plaintiffs or petitioners."

By the act for the better organization of the Treasury Department, 15th May, 1820, § 1, the agent of the treasury is to " superintend all orders, suits, or proceedings in law or equity, for the recovery of money, chattels, lands, tenements, or hereditaments, in the name and for the use of the United States." See also § 7, same act.

By the act of 29th May, 1830, this agency is transferred to the Solicitor of the Treasury, but the manner of bringing suits remains unchanged. See §§ 3, 5, and 8.

Second Point. The case should be dismissed, because there is no appreciable value in the matter sought to be decreed by the prayer of the relator, as between the United States and the defendants. The United States do not claim the land, but only the surrender of a patent, for which Hughes gave $219.32, and which, as consequence, he would receive back if the patent was cancelled. Act of 1789, § 11.

Third Point. The case should be dismissed, because there is no authority, by any law of the United States, for the courts of the United States to repeal or cancel a patent for land sold by the government, when the United States, as in this case, show that they have neither land nor money to gain by such decree. In other words, it is shown the United States have no interest in this suit; but interpose only as an act of grace,

officiating only in the office of prerogative. Had Hughes defrauded the government of its lands, the United States would have the same right as a citizen to sue in equity to cancel our title. But a land patent (so called) for lands sold by the United States, is only a deed of bargain and sale. It has nothing of the grace or generosity of royal favor. It is in no legal sense a grant. But by acts of Congress of 2d March, 1833, § 1, and 4th July, 1831, § 6, the title issued is called a patent, whether for lands granted or sold; yet it is only in virtue of these qualities of grant that it is in England the prerogative of the crown to repeal patents. 5 Com. Dig., tit. *Patent* (F), pp. 280, 281.

But even there, if the same thing be twice granted, the *scire facias* to repeal shall be brought by the first patentee, and not by the king. Ibid. p. 281 (F. 4).

This prerogative is of the common law. But the United States have no right to such prerogative. 6 Pet. 35. And have no common law. 7 Cranch, 32; 8 Pet. 658; 3 How. 104.

The United States in selling land, and in all matters of contract, does not assert its sovereignty, but acts as a citizen. 9 Wheat. 907. Constitutional governments cannot pronounce their own deeds void for any cause. 6 Cranch, 132. They are estopped by their deed. 6 Cranch, 137. An innocent purchaser of a government may plead purchase for valuable consideration. 6 Cranch, 135.

It is against public policy, that the land-officers should elect their favorite between two citizens claiming the same land by purchase, and involve the United States as a partisan in the strife. And it is against the practice of the land-office. See President Jackson's Instruction, 2 Pub. Land Laws, no. 60, p. 93; Instructions 4 and 5, Opin. Attorney-General, Vol. II. no. 57, pp. 86 and 87; Ibid., no. 88.

And the act of 12th January, 1825 (Land Laws, 402), which directs that purchasers of land from the United States, where the purchase is void by reason of a prior sale, shall be entitled to repayment of the purchase-money, " on making proof, to the satisfaction of the Secretary of the Treasury, that the same was erroneously sold," clearly contemplates, that the purchaser shall establish the fact in some sufficient manner, and not that the department, as its duty, shall decide the fact, and force its judgment upon the purchaser.

And in this form of suit Hughes cannot litigate his rights with his co-defendants, nor can have any decree in his favor, but the dismission of this plaint; for which he, by his demurrer, and his co-defendants by answer, both pray.

Fourth Point. The fact is so, and the court, on inspection of the information filed, will not fail to perceive it, that the real

contestant parties to the property or title in issue are the co-defendants Sewall and Hudson on one side, and D. M. Hughes on the other.   All are shown on the face of the bill to be residents of the State of Louisiana, viz. Sewall a resident on the land in controversy, Hudson an infant ward of the State, and Hughes a citizen of Red River.   For such a case as this, no jurisdiction of parties in the Circuit Court of the United States obtains.   And hence this case should be dismissed.

Fifth Point.   If the United States, or their attorney, had a right to institute this suit (which we deny), yet no law of Congress can be produced to authorize an appeal by the United States in such a case; and, without direct legislation permits the appeal, none is allowed.   6 Peters, 494 – 497; 11 Peters, 166; 1 Howard, 265; 3 Howard, 104 and 317; 8 Howard, 121.

Nor is it shown that the matter in issue between the United States and defendants is of value $ 2,000.   And hence the appeal should be dismissed.

Sixth Point.   But if this court asserts jurisdiction of the cause, we nevertheless maintain the decree of dismission was right, not only for the causes shown in the points 1, 2, 3, and 4 preceding (which are all involved in the demurrer), but also that the merits of the case made in the bill are with the demurrant, because no valid right of preëmption is shown in Goodbee to the land patented to Hughes.

We might admit, without prejudice to our case, that what the land-officers have decided in favor of Goodbee's preëmption is conclusive against us so far as within their jurisdiction. But we maintain the allowance of this preëmption is most palpably without law, and against law.   Omitting to note for the present, the numerous blunders of varied descriptions and mis-descriptions of the lands in controversy, it is shown by the patent, Exhibit E, that the land sold to Hughes is Sec. 54, T. 10, R. 12, containing $175\frac{46}{100}$ acres.   And this is the tract of land said by the bill, and by Exhibit D, to have been originally described as lot No. 1, but is subsequently correctly described as Sec. 54.   We note, then, first, that this is an irregular section, which could only bear the number 54 by being a private claim, and from this cause having the accumulated number over the thirty-six sections which compose a township of the public surveys.   Act of Congress, 18th May, 1796, § 2 (Land Laws, 50, 51); Act of 6th March, 1820, § 6 (Land Laws, 322). As an irregular section, and an entire section, it is fractional, including but 175 acres.   The bill shows this preëmption was claimed and accorded under the fifth section of the act of 12th April, 1814 (Land Laws, 244), which extends the act of 5th February, 1813 (Land Laws, 226), to Louisiana.   The claim,

then, in Louisiana must be under " the same restrictions, con-
ditions, provisions, and regulations in every respect," as by act
of 1813 is provided. Act of 1813, § 1, provides, " that no more
than one quarter-section shall be sold to any one individual, in
virtue of this act, and the same shall be bounded by the sec-
tional and divisional lines," &c. See Secretary Crawford's
Opinion, 2 Land Laws, 539, no. 478, that only a quarter-
section is allowable. And § 2 requires that the applicant, in
his notice of claim, " shall particularly designate the quarter-
section he claims."

On the law, then, it is clear beyond doubt that the land-
officers had no power or jurisdiction to grant preëmptions to
entire sections, or fractional sections, or to any quantity ex-
ceeding a divisional quarter. And such was the construction
of the Attorney-General, in 1814, of this act, on this point. 2
Land Laws, Op. no. 220 and no. 221. And the same construc-
tion of this act, when extended to Florida, by act of 22d April,
1826, is adhered to by the Attorney-General in 1826. See Op.
no. 330. And the same principle is decided in Opinion no. 7.

These authorities seem quite conclusive that the allowance
of this preëmption was against the plainest provisions of the
law, and the direct instructions of the superior department, and
therefore void. 3 How. 664, 665; 13 Pet. 519; 4 How. 502.

Seventh Point. The preëmption was void in its allowance,
because before survey of the land, by which its number and
subdivision could be known, or its allowance validated. 2 Land
Laws, no. 399.

The bill affects to make it an equitable merit, that, when this
application was made and allowed, neither the applicant nor
the land-officers knew on which side the Bayou Goula this
preëmption lay; and therefore it was assumed to lay on both
sides, but " principally on the north side." That they did not
know its number and sectional division, its contents and quan-
tity, because it had not been surveyed. The argument in the
bill, that these deficiencies resulted and continued from a delay
to " connect the public surveys," is sheer nonsense. The con-
nection of the surveys does not affect the actual surveys of the
separate parcels and divisions. This manifest disregard of the
law is seen in Exhibit B, which shows Goodbee's claim to be
in the county of Iberville, on the Mississippi River, and for 160
acres exactly. There is no township, range, section, or quarter-
section, nor the Bayou Goula, mentioned in this registry of
preëmption. And Exhibits Nos. 1, 2, 3, 4, with Sewall and
Hudson's answer, show that no particular lot or division was
applied for or granted; but only " 160 superficial acres," and
this proven to lie on " both sides of the Bayou Goula." And

the application was expressly granted by the register, " subject to the sectional and divisional lines to be hereafter run." Is it wonderful, with such records of entry, that the land should apparently remain unsold ?

But all this was palpably and expressly against the law of 1813, §§ 1 and 2, which distinctly requires that the land shall only be claimed or allowed after survey, and must be sought for and granted by its specific subdivisions. And see Instructions, 2 Land Laws, p. 384, no. 309.

Eighth Point. The alleged preëmption was clearly void, because not paid for by entry, &c. two weeks before the period assigned for the public sales, and therefore forfeited. Act of 1813, § 2.

It is unnecessary to inquire with what indulgence the landoffice might have regarded the numerous and palpable violations of law which this preëmption encounters. It now rests on law, in contest with a purchaser who has paid his money and got a legal title, and who has a right to combat this alleged superior equity by any circumstance which may impair it. 7 Wheat. 6. We know not, on this demurrer, at what precise time this land was exposed to public sale ; but, on the presumptions of law, Hughes could not have entered it as public lands, till after it was offered for sale at public outcry. Exhibit C shows us it was offered at public sale under the President's proclamation of 11th August, 1823. And these instructions or regulations were of like import with those of 1st January, 1836 (2. Land Laws, p. 125, no. 81), and which last was in force when Hughes purchased. And this court will presume what was required by the regulations to be done was in fact done. Therefore, this land was offered for sale on public notice, before Hughes bought it. And the bill shows, and Exhibit D shows, that this preëmption was not paid for till 3d April, 1846, being ten years after Hughes had entered and paid for it. Now, if Goodbee had a preëmption right in 1822 to this tract of land, the act of 1813, § 2, expressly forfeits it, if not entered before offered for sale (2 Land Laws, p. 112, no. 72 ; Ibid., p. 118, no. 77). And the price must all have been paid at the time of entry, by act of 24th April, 1820 (2 Land Laws, p. 384, no. 309). And if the land-officers had any power to indulge Goodbee for part payment of this land, it certainly could not lawfully extend to ten years after they had sold it to another, and for which delay no excuse is given ; and it is not pretended the public surveys were not connected when Hughes purchased the land in 1836.

Ninth Point. This preëmption, as against Hughes, a purchaser with legal title, is void, also, for vagueness, misdescrip-

tion and uncertainty, and to which 'the acts of the claimant, more than those of the land-officers, contributed. ·

He had applied and paid for 160 superficial acres, lying on both sides of the Bayou Goula, which had no survey, boundary, sectional subdivision, quantity, township, or range, which could identify it, or give it specific location. Claimed as lying on both sides of Bayou Goula, and registered (see Exhibit B as lying on the Mississippi River, could Hughes, or any one, be admonished it lay on the north side of Bayou Goula? Claiming 160 acres and no odd hundredths or other excess, who was bound to know it was a tract of $175\frac{46}{100}$ acres? Claimed and registered by some careless, unmeaning, and unauthorized designation of lot No. 1, who would suspect Sec. 54, T. 10, R. 12, was meant and intended by such description?

Now, on this demurrer, we claim to discriminate as to what the record was when Hughes purchased on the 14th of May, 1836, and what subsequent conjectures, annotations, and inter-lineations have made it.

There was, then, when Hughes purchased, no Sec. 54, T. 10, R. 12, assigned as Goodbee's preëmption, nor the Surveyor-General's commentary, of date 27th May, 1844, that Goodbee's 160 superficial acres had increased to $175\frac{46}{100}$, as per Exhibit A. And Register Laidlaw had not then discovered, as he did in 1846, that the word "sold," written in the tract book, opposite to this designated lot, meant sold to Goodbee, rather than Hughes, who had purchased it ten years before this discovery. And the pencilled name of "Hudson," in 1836, in same book, but fairly implies that it was put there after Hughes bought the land the same year. But neither of these is so remarkable as that, Goodbee not having paid for the land up to date (1846), and with the averment in the bill that the "assigns" of Goodbee, on the 3d of April, 1846, paid up the arrearage due on this preëmption, yet the register gives his certificate of the same date, that Goodbee, on the 26th of February, 1822, pur-chased lot No. 1, or Sec. 54, T. 10, R. 12, containing $175\frac{46}{100}$ acres, for which he made "payment in full, as required by law." While on the same date, as shown by the same Exhibit D, the receiver certifies that Goodbee, on the 3d of April, 1846, paid him $ 19.32, being residue in full for this same land. How much these post-dated certificates, contradictions, and transmu-tations of the records shall receive the sanction of the court, and, by their retrospective operation, conduce to deprive Hughes of his title, is submitted with but little apprehension as to the conclusions which must be arrived at.

· The charges in the plaint, that Hughes falsely represented to the land-officers that this section was subject to entry, and

that he falsely represented he was entitled to have the patent, and thus obtained his title, we regard as meaning nothing available to the case, though met on demurrer. No presumption of law can be entertained that the land-officers acted on the verbal representations of Hughes, and were so childishly cajoled, instead of the evidences of their records, and the laws and instructions which guide them in like cases. Besides, Exhibit C expressly reports this land to have been offered at public sale, by the proclamation of the President, before Hughes purchased it. And to these acts, which were the prerequisites in law that put the land in market, Hughes is not charged with being accessory.

Mr. Justice CATRON delivered the opinion of the court.

The attorney of the United States for the District of Louisiana on behalf of the United States filed an information in the nature of a bill in chancery, against David M. Hughes, having for its object the repeal and surrender of a patent for $175\frac{46}{100}$ acres of land, made to Hughes by the President of the United States, April 16, 1841. The bill proceeds on the ground that said patent was fraudulently obtained, being in violation of the rights of Sewall and Hudson, deriving title from John Goodbee, who entered the land as his preëmption claim under the act of April 12, 1814, paid the purchase-money, and got a certificate of purchase, in 1822, for 160 acres; but when the public surveys were executed, the legal subdivision was found to contain $15\frac{46}{100}$ acres more, to which Goodbee's right of preëmption also extended.

The validity of Goodbee's entries depends on the regulations of the land-office, made in pursuance of statutes enacted by Congress; and which statutes and regulations are accurately set forth by the Attorney-General in his argument in this cause, and need not be further stated here.

It appears that in 1836 Hughes entered the same land, with full knowledge that those holding possession under Goodbee's title were owners and cultivating a sugar-plantation on it. The existence of Goodbee's preëmption right and better title was overlooked at the land-office in Louisiana, where the entry of Hughes was made; and again at the General Land-Office until after his patent had issued.

As the bill was demurred to, no dispute can be raised on the question of fraud, nor can any doubt exist that this second purchase was fraudulently obtained, Sewall and Hudson being notoriously in possession of the land as owners when Hughes made his entry at the land-office.

1st. The first and main objection made for defendant Hughes is, that this proceeding is improper, and will not lie.

It is to be regretted that this was not a simple bill in equity brought by the United States against the defendant Hughes, praying that the patent might be annulled and surrendered by a decree in chancery, without any attempt of assimilating the proceeding to an information brought by the Attorney-General on behalf of the crown, in England, to repeal a patent. In this country, the lands of the United States, lying within the States, are held and subject to be sold (under the authority of Congress), as lands may be held and sold by individual owners, or by ordinary corporations; and similar remedies may be employed by the United States as owners, that are applicable in cases of others. This, we think, is manifest. It was so held in the case of King et al. v. The United States, 3 How. 773.

In substance, this is a bill in equity for and on behalf of the United States, because of an injury done to the United States by Hughes, the defendant, and we will not dismiss it for want of form.

By the Constitution, Congress is vested with power to dispose of the public lands, and to make all needful rules and regulations respecting them. Under existing regulations, Goodbee had a right to enter the land in dispute in exclusion of others, and did so; and the United States, as owner, having been paid for the land, was bound to make the purchaser a title, in the same manner that an individual would have been bound under similar circumstances.

As the patent to Hughes is a conveyance of the fee, the United States stand divested of the legal title, and therefore cannot fulfil their engagement with Goodbee and his alienees, to whom they stand bound for a legal title, until the grant to Hughes is annulled.

It is manifest that, if the agents of an individual had been thus imposed on, the conveyance could be set aside because of mistake on part of such agents, and fraud on part of the second purchaser, in order that the first contract could be complied with. Nor can it be conceived why the government should stand on a different footing from any other proprietor.

Hughes has no right to complain, for so soon as it was discovered that he had defrauded the government, and those claiming under it, his purchase-money was tendered, and a surrender of the patent demanded; but he refused to receive the money, or surrender his legal advantage.

2d. The demurrer having been sustained, and the bill dismissed by the Circuit Court, it is insisted here that no appeal would lie, because the matter in dispute does not appear to have amounted to $2,000. All the assignments from Goodbee down to the present owners (Sewall and Hudson) are ex-

hibited with the bill, as a part thereof; the first of which is a notarial conveyance from Goodbee to Bush, dated in 1822. It states that the consideration of $2,000 had been paid for the land; and, there being a sugar-plantation on it, we assume its value to be quite equal now. As we are bound by complainant's allegation of value, no controversy can be raised on the fact. If, however, any objection existed, value could be proved here in like manner as is usually done in cases of ejectment, where there is no allegation what the property in dispute is worth.

We are of opinion that the patent to Hughes should be vacated and annulled; and accordingly order that the decree of the Circuit Court of the District of Louisiana be reversed; and it is adjudged and decreed, that the patent made to David Michael Hughes by the President of the United States, on the 16th day of April, A. D. 1841, for $175\frac{46}{100}$ acres of land, being for section 54 in township 10 of range 12 east, in the district of lands subject to sale at New Orleans, Louisiana, be, and the same is hereby, vacated, and declared null and void. And it is also ordered and decreed, that said David Michael Hughes do, within one calendar month from the time of filing and entering the mandate of this court in the Circuit Court for the District of Louisiana, surrender said patent to the clerk of the aforesaid Circuit Court, who will certify on its face that said patent is annulled by this decree; which certificate he will sign and further authenticate under the seal of his court, and then forward said patent to the Commissioner of the General Land-Office at Washington city.

And it is further adjudged and decreed, that said David Michael Hughes be, and he is hereby, for ever enjoined from prosecuting any suit in law or equity on said patent, as evidence of title.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed; and this court, proceeding to render such decree as the said Circuit Court ought to have rendered, doth order, adjudge, and decree, that the patent made to David Michael Hughes by the President of the United States, on the 16th day of April, A. D. 1841, for section 54 in township 10 of range 12 east, in the district of lands subject to sale at New Orleans, Louisiana, containing $175\frac{46}{100}$ acres of

48 *

land, be, and the same is hereby, vacated and annulled; that the said David M. Hughes do, within one calendar month from the time of filing the mandate of this court in the said Circuit Court, surrender said patent to the clerk of said court; that the said clerk shall certify under the seal of the said court, on the face of the said patent, that it is annulled by this decree, and then transmit the same to the Commissioner of the General Land-Office at Washington city; that the said David M. Hughes be, and he is hereby, for ever enjoined from prosecuting any suit in law or equity on said patent as evidence of title. And it is further adjudged and decreed, that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to carry this decree into effect, and for such further proceedings to be had herein, in conformity to the opinion of this court, as to law and justice may appertain.