# HECKMAN *v.* UNITED STATES.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 496.    Argued October 12, 13, 1911.—Decided April 1, 1912.

The United States has capacity to maintain a suit to set aside conveyances made by allottee Indians of allotted lands within the statutory period of restriction; and this suit brought against numerous defendants, all of whom were grantees of allottees of the same tribe, is properly maintainable in equity; the return of the consideration to the grantee is not essential; there is no defect of parties because the allottee Indians making the conveyances are not joined; there is no misjoinder of causes of action, and the bill is not multifarious.

Congress has power to extend the restrictions upon alienation of allotted lands by allottee Indians, *Tiger* v. *Western Investment Co.,* 221 U. S. 286; and so *held* that the provision for extending the period of alienation of lands allotted in severalty to full-blood Cherokees in the act of May 27, 1908, 35 Stat. 312, c. 199, is a valid exercise by Congress of its power over Indian affairs.

The relations of the United States to the Cherokee Indians as established by treaties and statutes reviewed, and *held* that in executing the policy of extinguishing the tribal organization and title, and the allotment of the tribal lands in severalty, the intent of Congress was to fulfill the national obligation, not only by an equitable apportionment of the property but by safeguarding through suitable restrictions the individual ownership of the allottees.

The placing of restrictions upon the right of alienation was an essential part of the plan of individual allotment of tribal lands among the members of the Five Civilized Tribes; and such restrictions evinced the continuance to this extent of the guardianship of the United States over the Indians as wards of the Nation.

Conferring citizenship upon an allottee Indian is not inconsistent with retaining control over his disposition of lands allotted to him. *Tiger* v. *Western Investment Co.*, 221 U. S. 286.

The maintenance of limitations prescribed by Congress as part of its plan for distribution of Indian lands is distinctly an interest of the United States, and one which it may sue in its own courts to enforce.

A transfer of allottee lands in violation of statutory restrictions is not simply a violation of the proprietary rights of the Indian but of the governmental rights of the United States.

Where there is a violation of the rights of the United States, and a justiciable question as to the effect thereof, the United States may invoke the jurisdiction of a court of equity, and a pecuniary interest in the controversy is not essential. *United States* v. *American Bell Telephone Co.*, 128 U. S. 315.

Congress has power to authorize the Government to sue to maintain the statutory restrictions upon alienation of Indian allottee lands. *Minnesota* v. *Hitchcock*, 185 U. S. 373.

Where Congress has power to authorize the Government to sue, an appropriation for expenses of suits already brought is a recognition of the right to bring them; and so *held* that the provisions of the act of May 27, 1908, 35 Stat. 312, c. 199, and of subsequent acts making appropriations for suits brought to cancel conveyances made by Cherokee allottee Indians in violation of statutory restrictions on alienation are within the power of Congress.

The presence of the Indian grantors as parties to suits brought by the United States to set aside conveyances of allotted lands made in violation of statutory restrictions on alienation is not essential; nor are the grantees placed in danger of double litigation by reason of the absence of the grantors as parties.

The effect of an act of Congress passed in pursuance of a policy and a matter of general knowledge cannot be destroyed so as to assist those who attempted to profit by violating its provisions; and so *held* that when a conveyance is made by an allottee Indian in violation of statutory restrictions on alienation, the return of the consideration is not an essential prerequisite to a decree of cancellation.

*Quære*, but not presented on this record, whether cases may arise where, without interfering with the policy of restricting alienation,

the decree should provide in cancelling the transfers for a return of the consideration and the bringing in as parties of any person whose presence might be necessary.

The bill in a suit brought to cancel for the same reason in each instance a large number of conveyances of allotted lands, made by different members of the same tribe to different defendants, *held* not to be multifarious in this case as it is manifestly in the interest of justice to avoid unnecessary suits; nor is there in such a case a misjoinder of causes of action.

179 Fed. Rep. 13, modified and affirmed.

THE United States by its Attorney-General, upon the recommendation of the Secretary of the Interior, brought this suit in the Circuit Court of the United States for the Eastern District of Oklahoma to cancel certain conveyances of allotted lands made by members of the Cherokee Nation. Demurrer to the bill was sustained by the Circuit Court and the bill was dismissed. *United States* v. *Allen, and similar cases,* 171 Fed. Rep. 907. The judgment was reversed by the Circuit Court of Appeals and the trial court was directed to proceed with the suits in accordance with the views expressed in its opinion. 179 Fed. Rep. 13.

The Government states in its brief that between July 14, 1908, and October 12, 1909, the United States brought 301 bills in equity against some 16,000 defendants to cancel some 30,000 conveyances of allotted lands, made by as many or more grantors, members of the Five Civilized Tribes, upon the ground that the conveyances were in violation of existing restrictions upon the power of alienation. It is said that the selection and grouping of defendants in each case was determined by the substantial identity of the facts and propositions of law upon which the question of alienability of the lands depended.

Forty-six bills were filed to cancel 3715 conveyances of lands of Cherokee Indians.

This particular suit deals with conveyances by Cherokee allottees of the full-blood of lands allotted subsequent

to the act of April 26, 1906. 34 Stat. 137, c. 1876. The grantors were not made parties. There are involved a number of separate conveyances to distinct grantees, parties defendant, two of whom prosecute this appeal from the judgment of the Circuit Court of Appeals.

The bill alleges that under the treaties between the United States and the Cherokee tribe of Indians and its members, the United States granted to the Cherokee tribe certain lands in the Indian Territory, now the Eastern District of Oklahoma, and obligated itself by the terms of these treaties and of its laws to protect the Cherokee tribe in the enjoyment of the lands granted; that according to the terms of said treaties and laws, and of the patent to the lands, the Cherokee tribe and every member thereof have at all times been and now are without power to dispose of any interest in the lands without the authority of the United States, or otherwise than in the manner it prescribed; that the Government of the United States, by reason of the helpless and dependent character of the Indian tribes, and of their several members, is the guardian and has exclusive control of their property, by virtue of which there is imposed upon the United States the duty to do whatever may be necessary for their guidance, welfare and protection; that the Cherokee tribe has always been and is now treated as a tribe of Indians by the Government of the United States and its several branches; that this tribe is now under the care of an Indian agent duly appointed under the laws of Congress, and large sums are still appropriated by Congress for the benefit and protection of the tribe and of its individual members, and for the maintenance of schools; and that under the laws of Congress the Government of the United States still has a large sum of money in its possession belonging to the tribe, and there still remains unallotted a large area of tribal lands, the common property of the tribe.

It is further alleged that in the exercise of its powers to

regulate and govern the affairs of the Cherokee tribe of Indians and its members, having in view their welfare and the carrying out of its treaty obligations, Congress by the act approved July 1, 1902 (32 Stat. 716, c. 1375), provided that the lands belonging to the Cherokee tribe in the present State of Oklahoma should be allotted in severalty among its members, but deeming the Indians to be untutored and improvident and still requiring the protection and supervision of the General Government, it was provided by this act that the portion of the lands so allotted as homesteads should be inalienable, and further that the allotted lands other than homesteads should be alienable only in five years after the issuance of patent to the allottee, and that, in accordance with its provisions, the act of Congress was duly ratified by the Cherokee people on the seventh day of August, 1902.

The bill describes certain conveyances of lands situated in the Eastern District of Oklahoma made by Cherokee Indians to the defendants, respectively, with particulars as to the lands embraced in the conveyances, the consideration, the dates of execution, acknowledgment and recording, and also the dates of the allotment certificates and of the recording of allotment deeds. The dates of the conveyances were between November 19, 1904, and May 7, 1908, and of the allotment certificates between April 30, 1906, and May 4, 1908. It is alleged that each of the tracts of land described was land of the Cherokee tribe which had been allotted to full-blood Indians of that tribe, that is, to those mentioned as grantors in the conveyances specified; that they were so allotted as to be subject to restrictions upon their alienation and incumbrance, and were so subject at the date of the execution and recording of the deeds described, which restrictions have never been removed; that the facts concerning the allotments and restrictions were matters of public record and notorious, and that the restrictions were im-

posed by public laws of the United States of which the defendants had knowledge and by which they were put upon inquiry and notice as to all matters concerning the condition of the particular tracts of land mentioned in the bill; that the deeds had been secured by the defendants in willful violation of law and of the duty which rested upon this Nation and every member thereof, and for the purpose of unlawfully incumbering the allotted lands; and that by causing the deeds to be recorded the defendants had unlawfully obtained an apparent title or interest of record in the lands described in defiance of said agency supervision and in open violation and contempt of the laws of the United States to the irreparable injury of the Indians and in direct interference with the supervision and control, policy and duty of the Government of the United States in that behalf.

It is also averred on information and belief that the defendants have unlawfully secured from members of the Cherokee tribe other deeds, conveyances, mortgages, powers of attorney and contracts for and about their allotments, which the Indians and freedmen were without authority to make; that as these have not been recorded the complainant is unable to give a minute and correct description without the discovery prayed for; that the defendants are continuing to induce the members of the Cherokee tribe named in the bill and other members of said tribe to execute deeds and instruments for and about their allotments, and threaten that they will continue such unlawful acts; that this unlawful conduct will greatly harass the United States in the discharge of its duties and in the administration of its policy in relation to these Indians and compel it to bring many suits in order to annul the deeds and instruments which the defendants have taken and are taking as alleged; that in addition to the instruments specified in the bill upward of four thousand instruments of a similar nature purporting to con-

vey or to incumber the title to lands located within the Eastern District of Oklahoma and duly allotted to members of the Five Civilized Tribes or belonging to said tribes, have been executed and placed on record by the defendants herein and other persons and corporations in contravention of the treaties, entered into between the United States and the several Indian tribes, and the laws of the United States; and that unless the United States shall be permitted to join in its bills numerous defendants, against each of whom it has a like cause of action, and against each of whom it seeks the same relief, and whose pretended claims are based upon similar facts and involve precisely the same questions of law, it will be driven to the necessity of bringing a great number of distinct and separate suits, and that it will be practically impossible for the United States to prosecute, and for the courts to adjudicate and dispose of so large a number of separate and distinct suits within any reasonable length of time.

The bill prays that the specified conveyances be declared void and that the title to the lands described be decreed to be in the allottees or their heirs, subject to the terms, conditions and limitations contained in the treaties, agreements and laws of the United States. Discovery of all claims to lands allotted to any of the Cherokee tribe or to unallotted lands of the tribe, and the surrender of instruments for cancellation, are sought; and it is also prayed that all defendants in possession, or claiming possession, be ordered to vacate or to cease making such claims, and that the United States have such other and further relief as may be proper.

The objections to the sufficiency of the bill as set forth in the demurrers are thus summarized in the appellants' brief:

(1) That the United States has no capacity to maintain the suit.

(2) That the bill is wholly without equity.

(3) That there is a defect of parties.

(4) That there is a misjoinder of alleged causes of action.

(5) That the bill is multifarious.

The appeal from the judgment of the Circuit Court of Appeals, which reversed the judgment of the Circuit Court sustaining the demurrers, is taken under § 3 of the act of June 25, 1910, c. 408 (36 Stat. 837).

*Mr. Joseph C. Stone, Mr. Robert J. Boone* and *Mr. S. T. Bledsoe* for appellants: [1]

For treaties and statutory provisions affecting the lands of allottees in the Five Civilized Tribes, see as to Tribal Titles, of the Choctaws and Chickasaws, Treaties of October, 1820, 7 Stat. 210; September 27, 1830, 7 Stat. 333; of 1837, 11 Stat. 57; of 1855, act of Congress of May 28, 1830; Treaty of 1855, 11 Stat. 611; of 1866, 14 Stat. 769; of the Creeks; Treaty of February 1, 1833, 7 Stat. 417, and patent issued pursuant thereto; of 1852; Treaty of August 7, 1856; of the Seminoles; Art. 1 of Treaty of 1856, 11 Stat. 699; Art. III of Treaty of 1866, 14 Stat. 755; of the Cherokees; Treaty of May 6, 1828; of August 6, 1846, 9 Stat. 871.

As to title of allottees to individual allotments, see Atoka Agreement with the Choctaws and Chickasaws, § 29, act of June 28, 1898, 30 Stat. 495, and Supplemental Agreement, 32 Stat. 641; § 3, original Creek Agreement, 31 Stat. 861; Seminole Agreement, December 16, 1897, 30 Stat. 567; Cherokee Agreement, 32 Stat. 716.

All the above provisions with reference to the allotment of lands of the various tribes should be considered and

---

[1] The succeeding cases of *Mullen* v. *United States, post,* p. 448; *Goat* v. *United States, post,* p. 458; and *Deming Investment Co.* v. *United States, post,* p. 471, which were appeals taken by different parties from the decrees entered by the Circuit Court of Appeals in *United States* v. *Allen and similar cases,* 179 Fed. Rep. 13, were argued simultaneously, with this case.

construed in the light of the previous legislation looking to allotment.

For legislation affecting all five of the tribes, see act of March 3, 1893, 27 Stat. 645, authorizing the appointment of commissioners.

Pursuant to the authority conferred upon this commission to enter into agreements with the Five Civilized Tribes for the allotment in severalty of their lands and the provision that on the allotment of the lands held by such tribes, respectively, the reversionary interest of the United States therein should be relinquished and should cease, negotiations were entered into, resulting in the agreements above quoted from.

Relinquishment as used in this connection is correctly interpreted in *United States* v. *Joseph*, 94 U. S. 614.

When the members of each of the Five Civilized Tribes select, as required by the provisions referred to, the lands they desire to take in allotment, and that selection is approved, nothing further remains to be done by such members in order to perfect their title to the lands so selected. The issuance of the allotment certificate and patent which follows are mere ministerial acts. It requires neither allotment certificate nor patent to pass title to the allottee. The provision that "there shall be allotted," etc., contained in the various agreements is sufficient when the land is selected and designated to pass title to the allottee without the necessity of certificate or patent. *Wallace* v. *Adams*, 143 Fed. Rep. 716; *Jones* v. *Meehan*, 175 U. S. 1, 16; *Doe* v. *Wilson*, 23 How. 457; *Quinney* v. *Denney*, 18 Wisconsin, 485; *Crews* v. *Burcham*, 1 Black, 352; *French* v. *Spencer*, 21 How. 228; *Stark* v. *Starrs*, 6 Wall. 402; *Lamb* v. *Davenport*, 18 Wall. 307; *Ryan* v. *Carter*, 93 U. S. 78; *Best* v. *Polk*, 18 Wall. 112; *Oliver* v. *Forbes*, 17 Kansas, 113; *Clark* v. *Lord*, 20 Kansas, 390; *Francis* v. *Francis*, 99 N. W. Rep. 000, 203 U. S. 233; *United States* v. *Torrey*, 154 Fed. Rep. 263; *United States*

v. *Moore,* 154 Fed. Rep. 712; *New York Indians* v. *United States,* 170 U. S. 1.

The mere existence of restriction upon alienation imposed for the protection of the allottee vests no interest whatever in the United States in reversion or otherwise. A violation of the statute imposing restrictions upon alienation does not in any event redound to the interest of the United States or impair the title of the allottee. *Libby* v. *Clark,* 118 U. S. 250, 255; *Schrimpscher* v. *Stockton,* 183 U. S. 290, 299.

The whole estate having vested in the allottee, there can be no possible interest remaining in the United States. Not even a possibility of forfeiture or reversion.

The United States owns no property interest upon which to maintain this action, nor may the same be maintained for the protection of citizens, generally, against violations of law.

The sole authority of the Circuit Courts of the United States to exercise jurisdiction over causes where the United States is plaintiff or petitioner, is given by the act of August 13, 1888, 25 Stat. 434. For its construction see *United States* v. *Sayward,* 160 U. S. 493; *United States* v. *Payne Lumber Company,* 206 U. S. 467; *United States* v. *Anger,* 153 Fed. Rep. 671; *United States* v. *Paine Lumber Company,* 154 Fed. Rep. 263.

The former members of the Five Civilized Tribes are citizens of the United States and the State of Oklahoma, and not wards of either the state or the National Government. *Mackey* v. *Cox,* 18 How. 100; *Mehlin* v. *Ice,* 56 Fed. Rep. 12.

Allotment agreements were made by the various tribes and approval thereof given by Congress as follows:

Seminole Original Allotment Agreement (30 Stat. 567); Seminole Supplemental Allotment Agreement (31 Stat. 250); Choctaw and Chickasaw Allotment Agreement (30

Stat. 495–505); Supplemental Allotment Agreement (32 Stat. 641); Creek Allotment Agreement (31 Stat. 861); Creek Supplemental Agreement (32 Stat. 500), and Cherokee Allotment Agreement (32 Stat. 716).

The policy of isolation from surrounding country applied to Indians on Indian Reservations was never, in fact, applied to the territory of the Five Civilized Tribes. In 1890 there were 180,182 persons residing in Indian Territory, of whom 51,279 were Indians. In 1900, the population of Indian Territory had increased to 392,000, of which 52,500 were Indians. In 1890 the Indian population, which included a few more Indians than those of the Five Civilized Tribes, constituted 25.5 per cent of the total population and in 1900, 13.4 per cent.

These conditions, and the progress made in securing of allotment agreements with the various tribes, caused Congress in 1901 to deem it advisable to confer the full rights of citizenship upon every Indian in the Indian Territory. See act of March 3, 1901, 31 Stat. 1447.

For effect of the General Allotment Act of 1887 as applied to conditions similar to those in Oklahoma with reference to citizenship, see *United States v. Saunders*, 96 Fed. Rep. 268; *United States v. Kopp*, 110 Fed. Rep. 161; *Ex parte Viles*, 139 Fed. Rep. 68; *United States v. Dooley*, 151 Fed. Rep. 697; *United States v. Auger*, 153 Fed. Rep. 671; *Ex parte Savage*, 158 Fed. Rep. 214; *United States v. Boss*, 160 Fed. Rep. 132.

No such public policy exists as that upon which the jurisdiction of the trial court was sustained by majority of the Circuit Court of Appeals.

The allottees are indispensable parties. They own the lands involved and have such an interest in the subject-matter of the controversies that final decrees cannot be made without affecting their interest.

Every party to a contract of sale except one who has released his interest or an agent through whom the title

has passed is a necessary party to set it aside. *Shields* v. *Barrow*, 17 How. 130; *Coiron* v. *Millaudon*, 19 How. 113; *Gaylords* v. *Kelshaw*, 1 Wall. 81; *Ribbon* v. *Railroad Cos.*, 16 Wall. 446; *Lawrence* v. *Wirtz*, 1 Wash. C. C. 417; *Tobin* v. *Walkinshaw*, 1 McAll. 26; *Bell* v. *Donohoe*, 17 Fed. Rep. 710; *Florence Machine Co.* v. *Singer Mfg. Co.*, 8 Blatchf. 113; *Chadbourne* v. *Coe*, 45 Fed. Rep. 822; *Empire C. & T. Co.* v. *Empire C. & M. Co.*, 150 U. S. 159; *New Orleans W. Co.* v. *New Orleans*, 164 U. S. 471; *S. C.*, in C. C. A., 51 Fed. Rep. 479; *Clark* v. *Great Northern Ry. Co.*, 81 Fed. Rep. 282; but see *French* v. *Shoemaker*, 14 Wall. 314; *West* v. *Duncan*, 42 Fed. Rep. 430; *Smith* v. *Lee*, 77 Fed. Rep. 779.

In every case where the parties acted in good faith the court ought to decree a personal judgment against the allottees for the amount of the consideration, for it was paid by mistake and the consideration for the payment has failed. If the contracts were void, but in good faith, equity will impute a promise to repay. *Wrought Iron Bridge Co.* v. *Utica*, 17 Fed. Rep. 316; *City of Louisiana* v. *Wood*, 12 Otto, 294; *Marsh* v. *Fulton County*, 10 Wall. 676; *Tate* v. *Gains* (Okla.), 105 Pac. Rep. 193.

Though the void deeds will be treated as nullities, the law will imply just such an obligation to pay for the enhanced value to the premises on account of the improvements as the Secretary of the Interior would have permitted the allottees to contract upon proper application to him. Where the lands had no rental value, and, on account of the improvements so made in good faith, now have a great rental value, it should be decreed that the rentals or a part thereof be set aside each year until compensation shall have been made for the same. *Muskogee Development Co.* v. *Green* (Okla.), 97 Pac. Rep. 619; *White* v. *Brown* (Ind. T.), 38 S. W. Rep. 335; *Poplin* v. *Clausen*, 38 S. W. Rep. 974; *Shumate* v. *Harbin*, 15 S. E. Rep. 270; *Brockway* v. *Thomas*, 36 Arkansas, 518; *Beard* v. *Dansby*,

48 Arkansas, 182; 2 S. W. Rep. 701; *Potts* v. *Cullum,* 68 Illinois, 217.

The United States cannot maintain this bill. It is wholly devoid of equity. The United States has not offered to return the consideration; it is out of possession, and if the facts alleged are true, it has an adequate remedy at law. *Frost* v. *Spittley,* 121 U. S. 552; *Orton* v. *Smith,* 18 How. 263; *Dick* v. *Foraker,* 155 U. S. 404, 414; *United States* v. *Wilson,* 118 U. S. 86.

If the conveyances referred to are void they constitute no cloud upon the title of the owner thereof, and a bill will not lie to cancel the same, even though the other grounds of equitable jurisdiction are present. *United. States* v. *Saunders,* 96 Fed. Rep. 268; *Piersol* v. *Elliott,* 6 Pet. 96, 101; *Rich* v. *Braxton,* 158 U. S. 375, 407; *Kennedy* v. *Hazelton,* 128 U. S. 667, 672; *Town of Venice* v. *Woodruff,* 62 N. Y. 462, 467; *March, Executrix,* v. *The City of Brooklyn,* 59 N. Y. 280.

The bill of complaint is multifarious.

*The Solicitor General* and *Mr. A. N. Frost* and *Mr. Harlow A. Leekley,* Special Assistants to the Attorney General, for the United States:

The United States may by suit in equity enforce the restrictions imposed by it upon the alienation of allotted tribal lands by members of the Indian tribes. *Marchie Tiger* v. *Western Investment Co.,* 221 U. S. 286; *United States* v. *Allen,* 179 Fed. Rep. 13; *Conley* v. *Ballinger,* 216 U. S. 84; *United States* v. *Kagama,* 118 U. S. 375; *Worcester* v. *Georgia,* 6 Pet. 515; *In re Debs,* 158 U. S. 564; *United States* v. *Am. Bell Tel. Co.,* 128 U. S. 315; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273; *United States* v. *Rickert,* 188 U. S. 432; *In the Matter of Heff,* 197 U. S. 488; *Beck* v. *Flournoy Live Stock Co.,* 65 Fed. Rep. 30; *United States* v. *Flournoy Live Stock &c. Co.,* 69 Fed. Rep. 886; *Pilgrim* v. *Beck,* 69 Fed. Rep. 895; *United States* v. *Flour-*

*noy &c. Co.*, 71 Fed. Rep. 576; *Rainbow* v. *Young*, 161 Fed. Rep. 835.

The Indian allottees are not necessary parties to such a suit, as the United States has rights and interests of its own to conserve and is, moreover, under obligation to protect the Indians in those restrictions. *United States* v. *Allen*, 179 Fed. Rep. 13; *United States* v. *Am. Bell Tel. Co.*, · 128 U. S. 315; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273; *United States* v. *Hammers*, 221 U. S. 220; *Marchie Tiger* v. *Western Investment Co.*, 221 U. S. 286; *United States* v. *Trinidad Coal Co.*, 137 U. S. 160; *Pilgrim* v. *Beck*, 69 Fed. Rep. 895.

The bill is not multifarious for it joins only such transactions as depend for their validity or invalidity upon the same state of facts and the same propositions of law. Story on Equity Pleading, 14th ed., § 539; Jennison's Chancery Practice, 26; *Hale* v. *Allinson*, 188 U. S. 56; *Ill. Cent. R. R. Co.* v. *Caffrey*, 128 Fed. Rep. 770; *Bitterman* v. *L. & N. R. R. Co.*, 207 U. S. 205.

MR. JUSTICE HUGHES, after making the above statement, delivered the opinion of the court.

The conveyances, which this suit was brought to cancel, were executed by members of the Cherokee tribe of Indians, of the full-blood, of lands allotted to them in severalty. The statute under which the allotments were made (act of July 1, 1902, c. 1375, 32 Stat. 716), accepted by the Cherokee nation on August 7, 1902, provided that the lands should be inalienable for a period specified. Sections 11–15 (*Id.*, p. 717). The lands in question were "surplus" lands, that is, those other than homesteads. While the restrictions, applicable to lands of this character, were still in force, Congress extended the period of inalienability by the act of April 26, 1906. 34 Stat. 137, c. 1876. Section 19 of this act (*Id.*, p. 144) is as follows:

"SEC. 19. That no full-blood Indian of the Choctaw,

Chickasaw, Cherokee, Creek or Seminole tribes shall have power to alienate, sell, dispose of, or encumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this Act, unless such restriction shall, prior to the expiration of said period, be removed by Act of Congress; and for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior: *Provided, however,* That such full-blood Indians of any of said tribes may lease any lands other than homesteads for more than one year under such rules and regulations as may be prescribed by the Secretary of the Interior; and in case of the inability of any full-blood owner of a homestead, on account of infirmity or age, to work or farm his homestead, the Secretary of the Interior, upon proof of such inability, may authorize the leasing of such homestead under such rules and regulations: *Provided further,* That conveyances heretofore made by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed; but this shall not be held or construed as affecting the validity or invalidity of any such conveyance, except as hereinabove provided; and every deed executed before, or for the making of which a contract or agreement was entered into before the removal of restrictions, be and the same is hereby, declared void: *Provided further,* That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee."

The power of Congress thus to extend the restriction upon alienation was sustained by this court in *Tiger* v.

*Western Investment Co.*, 221 U. S. 286. There the question related to a conveyance of inherited lands, made by a Creek Indian, of the full-blood, without the approval of the Secretary of the Interior as required by § 22 of the act of 1906. The conveyance had been executed after the expiration of the five-year limitation upon alienation, prescribed by the supplemental agreement with the Creek Nation (act of June 30, 1902, c. 1323, § 16; 32 Stat. 503); but meanwhile, and during the continuance of the original restriction, the act of 1906 had been enacted. It was held that the restriction of the later statute was valid.

The reasoning of this decision is conclusive as to the validity of the extension by § 19 of the act of 1906 of the period of inalienability of lands allotted, as in this case, to full-blood Cherokees. And the same principle governs the restrictions provided by the act of May 27, 1908, c. 199, 35 Stat. 312.

It is not open to dispute that, upon the facts alleged, all the conveyances specified in the bill in this suit were executed in violation of restrictions lawfully imposed.

The principal question now presented is with respect to the capacity of the United States to sue in its own courts to enforce these restrictions.

The relations of the United States to the Cherokees have repeatedly been described in the decisions of this court. *Cherokee Nation* v. *Georgia*, 5 Pet. 1; *Worcester* v. *Georgia*, 6 Pet. 515; *United States* v. *Rogers*, 4 How. 567; *Mackey* v. *Coxe*, 18 How. 100; *The Cherokee Trust Funds*, 117 U. S. 288; *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641; *United States* v. *Old Settlers*, 148 U. S. 427; *Cherokee Nation* v. *Journeycake*, 155 U. S. 196; *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lowe* v. *Fisher*, 223 U. S. 95. But in view of the nature of the present controversy the facts of main importance may be briefly restated.

The United States made its first treaty with the Cherokees on November 28, 1785 (7 Stat. 18). Constituting one of the most powerful tribes of Indians which then inhabited the country, they claimed the principal part of the territory now comprised within the States of North and South Carolina, Georgia, Alabama and Tennessee. By this treaty, the Cherokees acknowledged that they were under the protection of the United States of America and of no other sovereign, the boundary of their hunting grounds was fixed, and it was provided that "for the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens or Indians, the United States in Congress assembled shall have the sole and exclusive right of regulating trade with the Indians, and managing all their affairs in such manner as they think proper." Another treaty with similar objects was made on July 2, 1791 (7 Stat. 39). In 1817, following a migration of a portion of the tribe to lands of the United States on the Arkansas and White Rivers, the Cherokee Nation ceded to the United States certain tracts which they formerly held, and in exchange the United States bound themselves to give to that branch of the Nation on the Arkansas as much land as they had received, or might thereafter receive, east of the Mississippi. 7 Stat. 156 (July 8, 1817). A further cession of land was made to the United States in 1819. 7 Stat. 195 (February 27, 1819).

By the terms of the treaty of May 6, 1828 (7 Stat. 311, 315), with the representatives of the Cherokee Nation, West, reciting the purpose of securing to them and their friends and brothers from the east who might join them, "a permanent home" which should "under the most solemn guarantee of the United States be, and remain, theirs forever—a home that shall never, in all future time, be embarrassed by having extended around it the lines or placed over it the jurisdiction of a Territory or State,"

the United States agreed to guarantee to the Cherokees forever seven millions of acres of land, as described, situated in what became known as the Indian Territory, and, in .addition, "a perpetual outlet, West, and a free and unmolested use of all the Country lying West of the Western boundary of the above described limits, and as far West as the sovereignty of the United States and their right of soil extend." On May 28, 1830, Congress authorized the President to assure title to the Indians to such exchanged lands, and to execute a patent if desired, "provided always, that such lands shall revert to the United States, if the Indians become extinct or abandon the same." 4 Stat. 411. A supplementary treaty confirming the guarantee of lands and fixing boundaries was made on February 14, 1833. 7 Stat. 414.

The continued presence of the Eastern Cherokees gave rise to serious controversies and oppressive legislation in the States where they resided. To terminate these difficulties and "with a view to reuniting their people in one body," a treaty was signed at New Echota, in the State of Georgia, on December 29, 1835. 7 Stat. 478. The Cherokee Nation ceded to the United States all their land east of the Mississippi River in consideration of the payment of five million dollars; and in addition to the lands described in the treaties of 1828 and 1833, the United States agreed to convey to the Cherokees eight hundred thousand acres for the sum of five hundred thousand dollars. It was stipulated that the ceded lands should not at any future time, without the consent of the Cherokee Nation, be included "within the territorial limits or jurisdiction of any State or Territory," and the United States agreed to secure to the Cherokee Nation "the right by their national councils" to make such laws as might be deemed necessary "for the government and protection of the persons and property within their own country belonging to their people or such

persons as have connected themselves with them: provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same."

The two tracts—the one consisting of the seven million acres and the "outlet," together aggregating 13,574,135.14 acres, and the other of 800,000 acres—were conveyed to the Cherokee Nation by patent on December 31, 1838, subject to the condition specified in the act of 1830, that the land should revert to the United States if the Cherokee Nation should become extinct or abandon the same. On September 6, 1839, the Cherokees adopted a constitution for the reunited nation. Dissensions having arisen among the members of the tribe, a new treaty was made with the United States on August 6, 1846 (9 Stat. 871), in which it was set forth that the lands occupied by the Cherokee Nation should "be secured to the whole Cherokee people for their common use and benefit," and provision was made for the settlement of differences. There was a further treaty on July 19, 1866. 14 Stat. 799.

The "Cherokee Outlet" was purchased by the United States in 1893 for the sum of $8,595,736. 27 Stat. 640.

At this time, the conditions in the Indian Territory were most unsatisfactory. There had been a large accession of whites who made no claim to Indian citizenship and were residing in the Territory with the approval of the Indian authorities. These greatly outnumbered the Indians. The existing means of government had failed of their purpose, and an exigency had arisen, originally unforeseen, requiring the adoption of new measures. This led to the enactment of legislation which contemplated

the dissolution of the tribal organizations and the distribution of the tribal property. By § 15 of the act of March 3, 1893, c. 209 (27 Stat. 612, 645), it was provided: "The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws and Seminoles; and upon such allotments the individuals to whom the same may be alloted shall be deemed to be in all respects citizens of the United States, . . . and upon the allotment of the lands held by said tribes respectively the reversionary interest of the United States therein shall be relinquished and shall cease." And by § 16 of the same act provision was made for the appointment of commissioners to enter into negotiations with the Five Civilized Tribes "for the purpose of the extinguishment of the national or tribal title to any lands within that Territory now held by any and all of such nations or tribes, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, respectively, as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such and [sic] adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within such India [sic] Territory."

But in executing this policy, Congress was solicitous to conserve the interests of the Indians and to fulfill the national obligation, not simply by assuring an equitable apportionment of the property, but by safeguarding the individual ownership of allottees through suitable restric-

tions which were designed to secure them in their possession and to prevent their exploitation.

The necessity for legislative action, and the purposes to be subserved, were fully presented in the report submitted in May, 1894, by the Senate Committee on the Five Civilized Tribes (S. Rept. No. 377, 53d Cong. 2d Sess.), a portion of which is quoted in the statement of facts made by the court in *Stephens* v. *Cherokee Nation, supra,* pp. 447–451. The committee said (p. 448): "'This section of the country was set apart to the Indian with the avowed purpose of maintaining an Indian community beyond and away from the influence of white people. We stipulated that they should have unrestricted self-government and full jurisdiction over persons and property within their respective limits, and that we would protect them against intrusion of white people, and that we would not incorporate them in a political organization without their consent. Every treaty, from 1828 to and including the treaty of 1866, was based on this idea of exclusion of the Indians from the whites and non-participation by the whites in their political and industrial affairs. We made it possible for the Indians of that section of country to maintain their tribal relations and their Indian polity, laws and civilization if they wished so to do. And, if now, the isolation and exclusiveness sought to be given to them by our solemn treaties is destroyed, and they are overrun by a population of strangers five times in number to their own, it is not the fault of the Government of the United States, but comes from their own acts in admitting whites to citizenship under their laws and by inviting white people to come within their jurisdiction, to become traders, farmers and to follow professional pursuits.'"

And, referring to the tribal lands, the report continued: "The theory of the Government was when it made title to the lands in the Indian Territory to the Indian tribes as bodies politic that the title was held for all of the Indians

of·such tribe. All were to be the equal participators in the benefits to be derived from such holding. But we find in practice such is not the case. A few enterprising citizens of the tribe, frequently not Indians by blood but by intermarriage, have in fact become the practical owners of the best and greatest part of these lands, while the title still remains in the tribe—theoretically for all, yet in fact the great body of the tribe derives no more benefit from their title than the neighbors in Kansas, Arkansas or Missouri. . . . As we have said, the title to these lands is held by the tribe in trust for the people. We have shown that this trust is not being properly executed, nor will it be if left to the Indians, and the question arises what is the duty of the Government of the United States with reference to this trust? While we have recognized these tribes as dependent nations, the Government has likewise recognized its guardianship over the Indians and its obligations to protect them in their property and personal rights. In the treaty with the Cherokees, made in 1846, we stipulated that they should pass laws for equal protection, and for the security of life, liberty and property. If the tribe fails to administer its trust properly by securing to all the people of the tribe equitable participation in the common property of the tribe, there appears to be no redress for the Indian so deprived of his rights, unless the Government does interfere to administer such trust."

The commission for which provision was made by the act of 1893—known as the Dawes Commission—also made reports to Congress (November 20, 1894, and November 18, 1895), "finding a deplorable state of affairs and the general prevalence of misrule." In the report of November 18, 1895, the commission said: "There is no alternative left to the United States but to assume the responsibility for future conditions in this Territory. It has created the forms of government which have brought

about these results, and the continuance rests on its authority. . . . The commission is compelled by the evidence forced upon them during their examination into the administration of the so-called governments in this Territory to report that these governments in all their branches are wholly corrupt, irresponsible, and unworthy to be longer trusted with the care and control of the money and other property of Indian citizens, much less their lives, which they scarcely pretend to protect." *Stephens* v. *Cherokee Nation, supra,* pp. 452, 453.

By the acts of June 10, 1896, c. 398 (29 Stat. 321, 339), and of June 7, 1897, c. 3 (30 Stat. 62, 84), the authority of the Dawes Commission was continued and extended; and provision was made for the hearing and determination of applications for citizenship in the tribes and for the making of rolls of membership. It was further provided by the statute of 1897, that none of the acts, ordinances, and resolutions (with certain stated exceptions) of the council of either of the Five Tribes should take effect if disapproved by the President. Then followed the act of June 28, 1898, c. 517 (30 Stat. 495), a comprehensive statute embracing provisions as to the enrollment of members of the tribes and for the allotment of "the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment, among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location and value of the same." By this legislation "the United States practically assumed the full control over the Cherokees as well as the other nations constituting the five civilized tribes and took upon itself the determination of membership in the tribes for the purpose of adjusting their rights in the tribal property." *Cherokee Nation* v. *Hitchcock, supra,* p. 306.

Between 1898 and 1902, allotment agreements with

the Five Civilized Tribes were approved by Congress. The allotment act of July 1, 1902, which related to the Cherokees (32 Stat. 716, c. 1375), provided (§ 63) that the tribal government should not continue longer than March 4, 1906. But by joint resolution of Congress passed March 2, 1906, the tribal existence and government of this tribe and of the others were "continued in full force and effect for all purposes under the existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes unless hereafter otherwise provided by law." 34 Stat. 822. A similar provision was contained in the act of April 26, 1906. 34 Stat. 137, 148.

The placing of restrictions upon the right of alienation was an essential part of the plan of individual allotment; and limitations were imposed by each of the allotment agreements. The separate statutes were supplemented by the general acts of 1906 and 1908, already mentioned. These restrictions evinced the continuance, to this extent at least, of the guardianship which the United States had exercised from the beginning. That the conferring of citizenship was in no wise inconsistent with the retention of control over the disposition of the allotted lands, was expressly decided in the case of *Tiger* v. *Western Investment Co.*, *supra*, in which the conclusions of the court were thus stated (p. 316):

"Conceding that Marchie Tiger by the act conferring citizenship obtained a status which gave him certain civil and political rights, inhering in the privileges and immunities of such citizenship unnecessary to here discuss, he was still a ward of the Nation so far as the alienation of these lands was concerned, and a member of the existing Creek Nation. . . . Upon the matters involved our conclusions are that Congress has had at all times, and now has, the right to pass legislation in the interest of the Indians as a dependent people; that there is nothing in

citizenship incompatible with this guardianship over the Indian's lands inherited from allottees as shown in this case; that in the present case when the act of 1906 was passed, the Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress to continue to restrict alienation by requiring, as to full-blood Indians, the consent of the Secretary of the Interior to a proposed alienation of lands such as are involved in this case; that it rests with Congress to determine when its guardianship shall cease, and while it still continues it has the right to vary its restrictions upon alienation of Indian lands in the promotion of what it deems the best interest of the Indian."

During the continuance of this guardianship, the right and duty of the Nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid. While relating to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States. A review of its dealings with the tribes permits no other conclusion. Out of its peculiar relation to these dependent peoples sprang obligations to the fulfillment of which the national honor has been committed. "From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen." *United States* v. *Kagama,* 118 U. S. 375, 384.

This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust. When, in 1838, patent was issued

to the Cherokees providing that it was subject to the condition that the granted lands should revert to the United States if the Cherokee Nation became extinct or abandoned them, neither the rights nor the duties of the United States were confined to the reversionary interest thus secured. And its relinquishment made it no less a matter of national concern that the restrictions designed to protect the Indian allottees should be enforced. But this object could not be accomplished if the enforcement were left to the Indians themselves. It is no answer to say that conveyances obtained in violation of restrictions would be void. That, of course, is true, and yet, by means of the conveyances and the consequent assertion of rights of ownership by the grantees, the Indians might be deprived of the practical benefits of their allotments. It was the intent of Congress that, for their sustenance and as a fitting aid to their progress, they should be secure in their possession during the period specified and should actually hold and enjoy the allotted lands. As was well said by the court below, "If they are unable to resist the allurements by which they are enticed into making the conveyances, will they be expected to undertake the difficult and protracted litigation necessary to set aside their own acts? To ask these questions is to answer them. Congress intended that both the Indians and the members of the white race should obey its limitations. A transfer of the allotments is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States. If these Indians may be divested of their lands, they will be thrown back upon the Nation a pauperized, discontented and, possibly, belligerent people." The authority to enforce restrictions of this character is the necessary complement of the power to impose them.

Whether these restrictions upon the alienation of the allotted lands had been violated and the alleged convey-

ances were void, was a justiciable question; and in order
that it might properly discharge its duty, and that it might
obtain adequate relief, suited to the nature of the case in
accordance with the principles of equity, the United States
was entitled to invoke the equity jurisdiction of its courts.
It was not essential that it should have a pecuniary interest
in the controversy. In *United States* v. *American Bell
Telephone Co.*, 128 U. S. 315, 367, where the suit was
brought to obtain the cancellation of certain patents,
this court in commenting upon the statements which had
been made in the case of *United States* v. *San Jacinto Tin
Co.*, 125 U. S. 273, with respect to the right of the United
States to sue, said: " This language is construed by counsel
for the appellee in this case to limit the relief granted at
the instance of the United States to cases in which it has
a direct pecuniary interest. But it is not susceptible of
such construction. It was evidently in the mind of the
court that the case before it was one where the property
right to the land in controversy was the matter of impor-
tance, but it was careful to say that the cases in which the
instrumentality of the court cannot thus be used are those
where the United States has no pecuniary interest in the
remedy sought, and is also under no obligation to the
party who will be benefited to sustain an action for his use,
and also where it does not appear that any obligation
existed on the part of the United States to the public or
to any individual. The essence of the right of the United
States to interfere in the present case is its obligation to
protect the public from the monopoly of the patent which
was procured by fraud, and it would be difficult to find
language more aptly used to include this in the class of
cases which are not excluded from the jurisdiction of the
court by want of interest in the government of the United
States. It is insisted that these decisions have reference
exclusively to patents for land, and that they are not
applicable to patents for inventions and discoveries. The

argument very largely urged for that view is the one just stated, that in the cases which had reference to patents for land the pecuniary interest of the United States was the foundation of the jurisdiction. This, however, is repelled by the language just cited, and by the fact that in more than one of the cases, notably in *United States* v. *Hughes, supra*, [11 How. 552], the right of the government to sustain the suit was based upon its legal or moral obligation to give a good title to another party who had a prior and a better claim to the land, but whose right was obstructed by the patent issued by the United States."

And in *In re Debs*, 158 U. S. 564, where the question was as to the jurisdiction of a court of equity at the suit of the Government to enjoin interference with the transportation of the mails, the court, while adverting to the fact that the United States had a property in the mails, declined to place its decision upon that ground alone, and rested it also upon governmental duty. The court said (pp. 584, 586): "Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. . . . The national government, given by the Constitution power to regulate interstate commerce, has by express statute assumed jurisdiction over such commerce when carried upon railroads. It is charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control."

In *United States* v. *Rickert*, 188 U. S. 432, the suit was brought to restrain the collection of certain county taxes alleged to be due in respect of permanent improvements

on, and personal property used in the cultivation of, lands occupied by Sioux Indians in South Dakota. The lands had been allotted under the general allotment act of February 8, 1887, 24 Stat. 389. One of the questions certified to this court was whether the United States had such an interest in the controversy or in its subjects as entitled it to maintain the suit; and the question was answered in the affirmative. It is true that, in that case, the statute provided that the United States should hold the land allotted for twenty-five years in trust for the sole use and benefit of the Indian allottee. But the decision rested upon a broader foundation than the mere holding of a legal title to land in trust, and embraced the recognition of the interest of the United States in securing immunity to the Indians from taxation conflicting with the measures it had adopted for their protection. The court said (p. 444): "In view of the relation of the United States to the real and personal property in question, as well as to these dependent Indians still under national control, and in view of the injurious effect of the assessment and taxation complained of upon the plans of the Government with reference to the Indians, it is clear that the United States is entitled to maintain this suit." By the act of August 15, 1894, c. 290, 28 Stat. 286, 305, as amended by the act of February 6, 1901, c. 217, 31 Stat. 760, Congress authorized suits to be brought against the United States, in its Circuit Courts, "involving the right of any person, in whole or in part of Indian blood or descent" (with certain exceptions) "to any allotment of lands under any law or treaty." *Sloan* v. *United States*, 193 U. S. 614. Prior to the amendment of 1901, the United States could not be sued in such a case. But the amendment required that "in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant." Commenting upon this, the court said in *McKay* v. *Kalyton*, 204 U. S. 458, 469: "Nothing could more clearly

demonstrate, than does this requirement, the conception of Congress that the United States continued as trustee to have an active interest in the proper disposition of allotted Indian lands and the necessity of its being made a party to controversies concerning the same, for the purpose of securing a harmonious and uniform operation of the legislation of Congress on the subject." And *In Matter of Heff*, 197 U. S. 488, 509, this court said: "In *United States* v. *Rickert*, 188 U. S. 432, we sustained the right of the Government to protect the lands thus allotted and patented from any encumbrance of state taxation. Undoubtedly an allottee can enforce his right to an interest in the tribal or other property (for that right is expressly granted) and equally clear is it that Congress may enforce and protect any condition which it attaches to any of its grants. This it may do by appropriate proceedings in either a National or a state court."

Not only was the United States entitled to prosecute this suit by virtue of the interest springing from its peculiar relations to the Indians and the course of dealing which had finally led to the plan of separate allotments accompanied by restrictions for the protection of the allottees, but Congress has explicitly recognized the right of the Government thus to enforce these restrictions and has made appropriations for the maintenance of suits of this description. And, at least, the power of Congress to authorize the Government to sue, in view of the relation of the United States to the subject-matter and of the nature of the question to be determined, cannot be doubted. *Minnesota* v. *Hitchcock*, 185 U. S. 373, 387, 388.

By the act of May 27, 1908, c. 199, 35 Stat. 312, which defined restrictions with respect to allotments to members of the Five Civilized Tribes, the representatives of the Secretary of the Interior were authorized to advise all allottees, having restricted lands, of their rights, and at the request of any such allottee to bring suit in his name

to cancel any conveyance or incumbrance in violation of the act and to take all steps necessary to assist the allottees in acquiring and retaining possession. But the following provision was added (p. 314):

"Nothing in this act shall be construed as a denial of the right of the United States to take such steps as may be necessary, including the bringing of any suit and the prosecution and appeal thereof, to acquire or retain possession of restricted Indian lands, or to remove cloud therefrom, or clear title to the same, in cases where deeds, leases or contracts of any other kind or character whatsoever have been or shall be made contrary to law with respect to such lands prior to the removal therefrom of restrictions upon the alienation thereof; such suits to be brought on the recommendation of the Secretary of the Interior, without costs or charges to the allottees, the necessary expenses incurred in so doing to be defrayed from the money appropriated by this act."

It is urged that this clause did not confer authority to sue, but was inserted merely to rebut any possible inference of an intention to deny this right to the United States. This seems to us a strained construction in view of the obvious purpose of the act. And it fails to give adequate effect to the words "such suits *to be brought* on the recommendation of the Secretary of the Interior, without costs or charges to the allottees, *the necessary expenses incurred in so doing to be defrayed from the money appropriated by this act.*" In addition to the appropriation of moneys for expenditure under the direction of the Secretary of the Interior, that act appropriated the sum of $50,000 "to be immediately available and available until expended as the Attorney General may direct," which was "to be used in the payment of necessary expenses incident to any suits brought at the request of the Secretary of the Interior in the eastern judicial district of Oklahoma;" with the proviso that $10,000 of this amount,

or so much as might be necessary, should be expended in the prosecution of cases in the western judicial district of that State. In 1909 (act of March 4, 1909, c. 299, 35 Stat. 945, 1014), a further appropriation of a like sum for the same purposes was made under the heading "Suits to set aside conveyances of allotted lands." Another appropriation was made in 1910 (act of June 25, 1910, c. 384, 36 Stat. 703, 748), under a similar heading with specific reference to the "Five Civilized Tribes," and also with the provision "and not to exceed ten thousand dollars of said sum shall be available for the expenses of the United States on appeals to the Supreme Court of the United States;" and still another to the same effect in 1911 (act of March 4, 1911, c. 285, 36 Stat. 1363, 1425).

We conclude that the United States has the capacity to prosecute this suit.

It is further urged that there is a defect of parties, on account of the absence of the Indian grantors. It is said that they are the owners of the lands and hence sustain such a relation to the controversy that final decree cannot be made without affecting their interest. *Shields* v. *Barrow*, 17 How. 130, 139; *Williams* v. *Bankhead*, 19 Wall. 563.

The argument necessarily proceeds upon the assumption that the representation of these Indians by the United States is of an incomplete or inadequate character; that although the United States, by virtue of the guardianship it has retained, is prosecuting this suit for the purpose of enforcing the restrictions Congress has imposed, and of thus securing possession to the Indians, their presence as parties to the suit is essential to their protection. This position is wholly untenable. There can be no more complete representation than that on the part of the United States in acting on behalf of these dependents—whom Congress, with respect to the restricted lands, has not yet released from tutelage. Its efficacy does not

·depend upon the Indian's acquiescence. It does not rest upon convention, nor is it circumscribed by rules which govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty.

When the United States instituted this suit, it undertook to represent, and did represent, the Indian grantors whose conveyances it sought to cancel. It was not necessary to make these grantors parties, for the Government was in court on their behalf. Their presence as parties could not add to, or detract from, the effect of the proceedings to determine the violation of the restrictions and the consequent invalidity of the conveyances. As by the act of Congress they were precluded from alienating their lands, they were likewise precluded from taking any position in the legal proceedings instituted by the Government to enforce the restrictions which would render such proceedings ineffectual or give support to the prohibited acts. The cause could not be dismissed upon their consent; they could not compromise it; nor could they assume any attitude with respect to their interest which would derogate from its complete representation by the United States. This is involved necessarily in the conclusion that the United States is entitled to sue, and in the nature and purpose of the suit.

These considerations also dispose of the contention that by reason of the absence of the grantors as parties, the grantees are placed in danger of double litigation; so that if they should succeed here they would still be exposed to suit by the allottees. It is not pertinent to comment upon the improbability of the contingency, if it exists in legal contemplation. But if the United States, representing the owners of restricted lands, is entitled to bring a suit of this character, it must follow that the

decree will bind not only the United States, but the Indians whom it represents in the litigation. This consequence is involved in the representation. *Kerrison* v. *Stewart*, 93 U. S. 155, 160; *Shaw* v. *Railroad Co.*, 100 U. S. 605, 611; *Beals* v. *Ill. &c. R. R. Co.*, 133 U. S. 290, 295. And it could not, consistently with any principle, be tolerated that, after the United States on behalf of its wards had invoked the jurisdiction of its courts to cancel conveyances in violation of the restrictions prescribed by Congress, these wards should themselves be permitted to relitigate the question.

In what cases the United States will undertake to represent Indian owners of restricted lands in suits of this sort is left under the acts of Congress to the discretion of the Executive Department. The allottee may be permitted to bring his own action, or if so brought the United States may aid him in its conduct, as in the *Tiger Case.* And, as already noted, the act of May 27, 1908, makes provision for proceedings by the representatives of the Secretary of the Interior in the name of the allottee. But in the opportunities thus afforded there is no room for the vexation of repeated litigation of the same controversy. And when the United States itself undertakes to represent the allottees of lands under restriction and brings suit to cancel prohibited transfers, such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose relating to the same property.

It is said that the allottees have received the consideration and should be made parties in order that equitable restoration may be enforced. Where, however, conveyance has been made in violation of the restrictions, it is plain that the return of the consideration cannot be regarded as an essential prerequisite to a decree of cancellation. Otherwise, if the Indian grantor had squandered the money, he would lose the land which Congress intended he should hold, and the very incompetence and

thriftlessness which were the occasion of the measures for his protection would render them of no avail. The effectiveness of the acts of Congress is not thus to be destroyed. The restrictions were set forth in public laws, and were matters of general knowledge. Those who dealt with the Indians contrary to these provisions are not entitled to insist that they should keep the land if the purchase price is not repaid, and thus frustrate the policy of the statute. *United States* v. *Trinidad Coal Co.*, 137 U. S. 160, 170, 171.

But it is suggested that there may be instances where the consideration could be restored without interfering with the policy which prohibited the transfer; that is, without in any way impairing the right to the recovery of the land or the assurance to the Indian of his possession free from incumbrance. It is said, for example, that there may have been an exchange of lands, and that the Indian grantor should not, on retaking the restricted lands, be permitted at the same time to retain those which he has received from the grantee. Or there may be other property held by the Indian grantor free from restrictions, so that restoration of the consideration may be enforced without working a deprivation of the restricted lands contrary to the act of Congress. We need not attempt to surmise what cases of this sort may arise. It is sufficient to say that no such case is here presented. It is not presented by the mere allegation of the bill that the conveyances assailed purport to have been made for pecuniary consideration. It will be competent for the court, on a proper showing as to any of the transactions that provision can be made for a return of the consideration, consistently with the cancellation of the conveyances and with securing to the allottees the possession of the restricted lands in accordance with the statute, to provide for bringing in as a party to the suit any person whose presence for that purpose is found to be necessary.

A further objection is that the bill is multifarious. But in view of the numerous transfers which the Government attacks, it was manifestly in the interest of the convenient administration of justice that unnecessary suits should be avoided and that transactions presenting the same question for determination should be grouped in a single proceeding. The objection to the misjoinder of causes of action is likewise without merit.

Our conclusion is that the suit was well brought. The judgment of the court below is affirmed with the modification that the cause shall proceed in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE LURTON dissents on the question of jurisdiction, but not on the merits.