## PAN–AMERICAN PETROLEUM CO. et al. v. UNITED STATES.[*]

(Circuit Court of Appeals, Ninth Circuit. January 4, 1926.)

No. 4651.

1. **Evidence** ⚖⟶244(11)—**Declarations as to past events by officer or agent of corporation are admissible against corporation.**

Declarations of officer or agent of corporation, consisting of narrative of past events, are admissible against corporation; their admissibility not necessarily depending on length of time between occurrences and declarations.

2. **Mines and minerals** ⚖⟶5—**Statute held to limit exchange of royalty oil under leases for fuel oil for current use of navy.**

Act June 4, 1920, § 1, being Comp. St. Ann. Supp. 1923, § 2804i, authorizing Secretary of Navy to develop naval petroleum reserves and to use, store, exchange, or sell products thereof, provided that sums turned into treasury for royalties not to exceed $500,000 were available for such purpose, *held* to limit exchange of royalty oils under leases to not exceeding $500,000 for fuel oil for current use of navy in existing depots, and did not authorize exchange for new storage facilities, in view of Act March 4, 1913, repealing Rev. St. § 1552, and Rev. St. §§ 3617, 3618, 3709, 3732, 3733, being Comp. St. §§ 6606, 6609, 6832, 6884, 6886, and sections 6873, 6885, and Act Feb. 25, 1920, being Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss).

3. **United States** ⚖⟶68—**Contracts for exchange of royalty oil for fuel oil and storage facilities held invalid unless authorized by Congress, regardless of benefits.**

Contracts to furnish government specified quantity of fuel oil and storage facilities at specified points, in consideration for specified quantity of crude oil from naval petroleum reserves, were invalid, unless authorized by Congress, regardless of whether contracts were beneficial to United States or United States received full value.

[*]Rehearing denied February 1, 1926. Certiorari granted 46 S. Ct. 356, 70 L. Ed. —.

**4. Mines and minerals ⬦⊃5—Government entitled to cancellation of lease of naval reserves obtained by fraud, regardless of pecuniary injury.**

Fraud, undue favoritism, and misconduct by government officer *held* to entitle government, regardless of pecuniary injury, to cancellation of oil leases in naval petroleum reserves and contracts for exchange of royalty oils for fuel oil and storage facilities.

**5. Equity ⬦⊃66—Maxim that "he who seeks equity must do equity" is merely guiding principle, and not exact rule governing all cases.**

Maxim that "he who seeks equity must do equity" means that he who seeks aid of equitable court subjects himself to *imposition of such terms as settled principles of equity require*, but it is only a guiding principle, and not an exact rule governing all cases.

**6. Equity ⬦⊃66—Maxim that one seeking equity must do equity held inapplicable to suit by United States to vindicate dominion over public lands.**

Maxim that one seeking equity must do equity is not applicable to suit by United States to vindicate its dominion over public lands and to avail itself of substantial rights under statutes.

**7. Mines and minerals ⬦⊃5—On cancellation of oil leases and contracts for fraud, government not required to pay for work done.**

In suit by government to cancel oil leases and contracts for exchange of royalty. oil for fuel oil and storage facilities for fraud, government will not be required. to credit contractor with cost of storage facilities and other improvements constructed by contractor on government lands.

Appeal and Cross-Appeal from the District Court of the United States for the Northern Division of the Southern District of California; Paul J. McCormick, Judge.

Suit by the United States against the Pan-American Petroleum Company and another. From a decree for plaintiff (6 F. [2d] 43), granting plaintiff insufficient relief, defendants appeal, and plaintiff cross-appeals. Affirmed in part, and reversed and remanded in part.

The United States, in a bill in equity against the two corporations named as parties defendant—which herein will be called respectively the petroleum company and the transport company—alleged that a fraudulent conspiracy was formed between Edward L. Doheny, the chief executive officer of the defendants, and Albert B. Fall, Secretary of the Interior of the United States, to procure for the defendant companies the execution of a contract dated April 25, 1922, a lease of a portion of Naval Reserve No. 1, situated in California, a further contract of December 11, 1922, and a lease for 20 years

covering the remainder of Naval Reserve No. 1, dated December 11, 1922. The object of the suit was to rescind and cancel said contracts and leases and obtain a decree for accounting.

The bill alleged that between said conspirators an agreement was made, prior to November 30, 1921, that, if Secretary Fall could bring about the execution of said instruments, he was to receive for so doing $100,000 from Edward L. Doheny, that on or about November 30, 1921, Doheny, in furtherance of said conspiracy, paid Fall the $100,000 reward so promised to him, and that thereafter Fall, in pursuance of said conspiracy, awarded the said contract of April 25, and caused to be executed and delivered the said lease of June 5, and caused the said contract and lease of December 11 to be executed.

The bill alleged that, by the contract of April 25, 1922, made between the transport company and the United States by the Acting Secretary of the Interior, it was agreed to exchange crude oil to be produced from Naval Petroleum Reserves Nos. 1 and 2 in the state of California, which oil was unsuitable for fuel for the United States navy, for fuel oil suitable for the use of said navy, to be delivered by the corporation at the United States naval station at Pearl Harbor, Hawaii, the corporation agreeing to furnish 1,500,000 barrels of fuel oil, and to deliver the same into storage facilities to be by it constructed according to specifications in consideration of the delivery to the corporation of 5,878,905 barrels of crude oil from said naval reserves, with a further provision that the corporation should be granted by the government a preferential lease on certain portions of Reserve No. 1 not included in the contract, in case the Secretary should decide to lease the same.

It was alleged also that the said award of the contract to the transport company was made without competitive bidding, and that it gave to said corporation a prior right or option to become the lessee of certain portions of Naval Reserve No. 1, and was so drawn purposely and intentionally to secure said right to that corporation, to the detriment and in fraud of the rights of the United States, and to prevent other persons or corporations from becoming the lessee, and to prevent competitive bidding or open competition to any lease on lands in said reserve; that the intention between Fall and Doheny was that the latter's company should become the lessee of the entire reserve; that,

pursuant to the said unlawful agreement, the instruments of April 25, 1922, and December 11, 1922, were executed secretly and privately and without competition, and that all the agreements and leases referred to in the bill are illegal and void by reason of said fraud and illegal conspiracy, and for the further reason that no authority was lodged in the officers of the United States who acted therein to execute the same, and that they were unauthorized by law.

The prayer of the bill was, in substance, that the contracts and leases be surrendered to be canceled, that the defendants be enjoined from further trespassing upon the lands of the United States under or by virtue of said instruments, and that the defendants be required to account for all oil received or taken by them under the terms of said instruments.

The answer denied the allegations of fraud, conspiracy, and bribery, asserted the validity and legality of the contracts and leases, and alleged in defense that the plaintiff had not tendered to the defendants the amount which they were justly and equitably entitled to receive under said contracts and leases, and had failed to offer to do equity in the premises, and alleged that the bill was without equity.

In substance, the findings of fact of the trial court are that the transport company, a corporation of which Edward L. Doheny was president up to December 7, 1923, owned and absolutely controlled the entire capital stock of its codefendant, and that, at all times mentioned in the complaint, Doheny directly or indirectly controlled over 50 per cent. of the capital stock of the transport company, and was in fact in effective control of the policies and actions of both said companies. On September 2, 1912, the President made an executive order setting apart a portion of the lands in Petroleum Reserve No. 2, ordering that they should be held for the exclusive use or benefit of the United States navy, and on May 31, 1921, President Harding made an executive order authorizing the Secretary of the Interior to lease producing oil wells within any naval petroleum reserves and to permit the drilling of additional wells or to lease the remainder or any part of a claim upon which such wells had been drilled, and directing the Secretary of the Navy to conserve, develop, use, and operate by contract, lease, or otherwise, unappropriated lands in naval reserves, and committing to the Secretary of the Interior the administration and conservation of oil and gas bearing lands in the Naval Reserves,

but providing that no general policy as to drilling or reserving lands in a naval reserve should be changed or adopted except in consultation and co-operation with the Secretary or Acting Secretary of the Navy. The order authorized and directed the Secretary of the Interior to perform any and all acts necessary for the production, conservation, and administration of the said reserves, subject to the conditions and limitations contained in the order and the existing laws, or such laws as might thereafter be enacted by Congress pertaining thereto.

Secretary Fall was very active in procuring the transfer of the naval oil reserves from the Navy Department to the Interior Department, and, after the order of May 31, 1921, he dominated the negotiations that eventuated in the contracts and leases in the suit. The Secretary of the Navy was absent through all said negotiations and took no active part therein, but signed the contracts of April 25, 1922, and December 11, 1922, and the lease of December 11, 1922, and the letter of April 25, 1922, under misapprehension and without full knowledge of the contents thereof. On July 8, 1921, Fall wrote to Doheny:

"There will be no possibility of any further conflict with naval officials and this department, as I have notified Mr. Denby that I should conduct the matter of naval leases under the direction of the President without calling any of his force in consultation, unless I conferred with himself personally upon a matter of policy. He understands the situation, and that I shall handle the matter exactly as I think best, and will not consult with any officials of any bureau in his department but only with himself, and such consultation will be confined strictly and entirely to matters of general policy."

Doheny and the defendants understood, from and after July 8, 1921, and acted upon the belief, that Fall had authority to make contracts and leases touching royalty oils from land of the naval reserve and they dealt with him accordingly. Between July 8, 1921, and October 25, 1921, Fall and Doheny held personal conferences with regard to the royalties reserved under a lease that had been granted to the petroleum company for a strip of land in section 1, township 31 south, range 24 east, in Kern county, Cal., and between the same dates they held conferences respecting the proposal to be made by the transport company, whereby the latter should receive from the United States royalty oil accruing from leases on

Naval Reserves No. 1 and No. 2 in California, and, in consideration thereof, agree to erect certain storage tank facilities at Pearl Harbor, Hawaii, and fill the same with fuel oil. At said conferences the matter of granting further leases on Naval Reserve No. 1 was discussed, and on October 25, 1921, and prior to March 7, 1922, Fall and Admiral John K. Robison, the personal representative of the Secretary of the Navy in naval reserve matters, agreed that the proposed contract for the construction of tankage facilities and filling the same should be kept secret, not for military reasons, but in order that Congress and the public might not know what was being done, and in fact the proposed contract was concealed and kept secret until after the award was made on April 18, 1922.

At and prior to November 30, 1921, there was pending in the Department of the Interior, for action by Fall as Secretary, a petition of the petroleum company praying for reduction of the royalty of 55½ per cent. reserved to the United States in the lease of July 12, 1921, of certain land in Naval Reserve No. 1. At the same time there was pending before the Department of the Interior a proposition by the transport company that, in consideration of the receipt of royalty oils by said company and the granting of further leases of lands in Naval Reserve No. 1, the company would agree to erect certain storage tank facilities at Pearl Harbor, Hawaii, and fill the same with fuel oil. On November 28, 1921, Doheny, on behalf of the transport company, wrote to Fall that, in view of the cost of fuel oil, the cost of delivery of 1,485,000 barrels at Pearl Harbor would be $2,821,500, which, added to the cost of constructing the necessary tanks to store the same, would make a total of $3,360,420, and that, to pay the contractor for both tanks and oil in royalty accrued oil from the Naval Reserve, it would require 2,973,823 barrels. The letter suggests that the matter be turned over to First Assistant Secretary Finney, to arrange the details with Rear Admiral Robison during Secretary Fall's proposed absence. On the following day Fall wrote to Admiral Robison, submitting to him Doheny's letter, and saying:

"Should you think best to accept this proposition, then of course it would be necessary in my judgment to turn over to Col. Doheny if we can do so, leases upon further wells or area in the naval reserve in which he is now drilling. If this is done, it must be understood that the royalty must be made less than are the present royalties being paid by the Midway and Pan-American. * * . *
The two companies named are pumping their wells, and so of course they are not making any money, but will experience a loss in the payment of a 55 per cent. royalty to the government. If you approve the proposition, will you kindly indicate such approval by simple indorsement upon Col. Doheny's letter to myself, signed by yourself. Your simple O. K. will be sufficient."

On November 30, 1921, Fall was ready and desirous to consummate a contract with the transport company along the lines outlined in the two letters just referred to, which letters expressed and implied an understanding and agreement between Fall, as Secretary of the Interior, and Doheny, as executive and managing officer of the transport company, that Fall, upon the execution of the contracts as suggested in the letter of November 28, 1921, would grant to that corporation further and additional leases in Naval Petroleum Reserve No. 1 in consideration of the construction of storage facilities for 1,485,000 barrels of fuel oil at Pearl Harbor and filling of the same with fuel oil in exchange for royalty crude oil due the United States from existing leases and further leases agreed to be made in the naval petroleum reserves.

Prior to November 30, 1921, Fall and Doheny discussed a proposal that Doheny should advance and deliver to Fall the sum of $100,000 for the personal use of the latter, and Doheny agreed to furnish said sum when Fall should need it, and, on that date, Doheny, then being in New York City, did at the request of Fall send to him at Washington $100,000, not n the usual manner of business transactions, but in currency obtained from a bank by the use of the check of Doheny's son. The currency was "carried in a satchel" by Doheny's son from New York to Washington, and by him delivered to Fall, but no entry of the withdrawal of said currency appears in the account of Edward L. Doheny with the bank on which the check was drawn, and no entry of said advance or of any personal transaction connected therewith between Fall and Doheny was ever made a matter of record in the books of the latter or of either of the defendant corporations, but on November 30, 1921, Fall handed to Doheny's son, who delivered the same to his father, a note payable on demand, with interest after date, in the sum of $100,000 to said Doheny at New York or Los Angeles, Cal., value received.

No sum, however, either on account of principal or interest has been paid by Fall to Doheny on account of said note or said money so advanced. Within a few weeks after receiving the note, Fall's signature was torn therefrom by Doheny, and said note remains so torn. The purpose of so tearing the note was that it might not, in the hands of third parties, be an enforceable obligation against Fall.

On or before December 1, 1921, Fall issued instructions to his subordinates in the Department of the Interior that the petroleum company's petition for the reduction of royalties under the lease of July 12, 1921, be refused, and that, instead thereof, the company should as relief be granted a lease at regulation Interior Department royalties in section 1, township 30 south, range 24 east, Kern county, Cal., in Naval Reserve No. 1. From January 27, 1922, to April 15, 1922, Fall knew that the transport company would make a bid to construct storage tankage facilities at Pearl Harbor and fill the same with fuel oil, in consideration of the delivery to it of royalty oil of the United States, and in consideration that it be assured of further leases in Naval Reserve No. 1, and that the bid to be named by said corporation in construction of storage facilities and filling the same with fuel oil would be at cost, but he knew that the bid would involve the granting to said corporation of further oil and gas leases of the land within the said Naval Reserve No. 1. Aside from certain officers and agents of the United States and those operating the corporation, no others knew that the corporation would bid at cost for the construction and the filling of said storage facilities, nor were any informed by Fall or by any person on behalf of the United States that a bid conditioned upon the assurance to the bidder of further leases in Naval Petroleum Reserve No. 1 or a preferential right to leases therein would be considered.

Due to Fall's interest in furthering a contract with the transport company for constructing and filling storage tank facilities at Pearl Harbor and granting such further leases, the said corporation and its engineering representative were from December, 1921, to April 15, 1922, kept in close touch with the development of the plans for constructing the tankage facilities, and had opportunities for conference and advice from the officers and employés of the United States which no other bidder was afforded. The only other oil companies conferred with by the officers of the United States, concerning the project at Pearl Harbor and the proposed contract, were the Standard Oil Company of California, the General Petroleum Company, the Associated Oil Company, the Pacific Oil Company, and the Union Oil Company of California. Prior to April 15, 1922, Fall knew that the General Petroleum Company considered the proposed contract illegal and would not submit a bid, accordingly no invitations for proposals were sent to it. Fall also knew that the counsel for the Standard Oil Company was of the opinion that the proposed contract was illegal, and had written an opinion to that effect, and Fall knew that said company would not submit a bid. He knew, or could have known, prior to April 15, 1922, that the Union Oil Company of California had not been asked to submit a bid. He knew prior to April 15, 1922, that the Associated Oil Company would not submit a bid except upon condition that authority be obtained from Congress. He knew prior to April 15, 1922, that invitations had been furnished to two construction companies, but he was of the opinion, and so stated, that it was impossible for construction companies to make bids, for the reason that the construction would have to be paid for by delivery of royalty oils belonging to the United States. On April 15, 1922, the bids were opened. The Associated Oil Company's bid was conditioned upon Congressional action approving the contract. A proposal from the Standard Oil Company of California applied only to the furnishing of fuel oil.

Aside from these, the only bids were those of the transport company. That company submitted two bids marked "A" and "B." In proposal B, a smaller lump sum in barrels of crude royalty oil was named than in proposal A. It agreed that, if the contractor's actual cost of construction were less than a mentioned stipulated amount, any saving below that stipulated amount would be credited to the government, and the proposal was conditioned upon the granting by the United States of a preferential right to the bidder to become the lessee in all leases thereafter to be granted by the United States for recovery of oil and gas in Naval Petroleum Reserve No. 1. No other bidder was invited to compete on the terms mentioned in proposal B, or upon any terms granting preferential rights to leases, and no person or corporation was advised that any bid would be received for doing the construction work at cost.

Fall was not present at the opening of

the proposals. When he left Washington on April 13, 1922, he gave instructions to his subordinates that no bid should be accepted and no contract awarded without his first being informed and · without his consent thereto. On April 18, 1922, Finney, the Acting Secretary of the Interior, telegraphed to Fall advising him that he and Admiral Robison recommended the acceptance of said proposal B, and on the same day Fall telegraphed his consent thereto. Finney notified the transport company of the acceptance of its proposal B, but, before the contract was executed, the vice president of that corporation stated to Finney that his company did not desire to proceed further unless the United States would agree 'that within twelve months from the date of the contract it would grant to the corporation a lease or leases on some portion of the lands within Naval Reserve No. 1. On April 20, 1922, Ambrose, chief petroleum technologist of the Bureau of Mines of the Department of the Interior, was sent, with documents and papers relating to the contract, to New Mexico to consult with Fall. On April 23, 1922, Fall telegraphed instructions to Finney to execute the contract. One of the matters about which Ambrose was instructed to confer with Fall was the question whether Denby, Secretary of the Navy, should be made a party to the proposed contract, and, on April 23, 1922, Fall by telegraph answered in the affirmative. The question whether the Secretary of the Navy should be made a party to the agreement or whether the executive order of May 31, 1921, had any legal force and effect, was originally raised by Cotter, vice president and attorney of the transport company. He refused to permit his company to enter into the contract unless the Secretary of the Navy were made a party thereto and signed the same.

From the inception of negotiations concerning the contract for the erection of storage facilities and filling the same 'with fuel oil, Fall kept in touch with the matter, and no question of policy or action of. importance was determined without his consent. The condition of proposal B touching a preferential right to leases was inserted for the express purpose of preventing any other company from having an opportunity to obtain leases in said naval reserve, and so that the said bidder might be able to eliminate competition for such leases as the United States might thereafter decide to make. Before the contract was executed, Finney and Denby wrote to Cotter that the Department of the Interior would agree to grant

to his company, within one year from the date of a contract for the Pearl Harbor project, leases to drill on the N. E. ¼ of sec. 3, Tp. 31 S., R. 24 E., and the strip of land lying in the E. ½ of sec. 34, Tp. 30 S., R. 24 E., and specifying the rate of royalty that would be charged thereon. The guaranty. of certain specified leases in that letter was not necessary, nor was it necessary to make the lease of June 5, 1922, to prevent drainage. The purpose of the guaranty of certain leases in the letter of April 25, 1922, was to assure the production of additional royalty oil to be used in payment for the construction of storage tankage facilities at Pearl Harbor and 'filling the same with fuel oil.

The posted field price of crude oil in California declined rapidly after making the contract of April 25, 1922. In the autumn of 1922 Doheny was in consultation with Fall concerning a proposal that the transport company should at once become lessee of certain areas in Naval Reserve No. 1, and in consideration thereof should agree to do for the United States certain things mentioned in a written proposition. The proposal was reduced to writing by Doheny and delivered to Fall some time in October or November. Fall delivered it to certain other officers and employés of the United States with his approval. Doheny, in a subsequent written proposal, enlarged his proposition and made further suggestions as to areas to be leased and the consideration which his company would give therefor. He and Fall conferred together concerning the schedules of royalty to be inserted in the proposed lease which was to be made to the petroleum company, with the result that they agreed upon a schedule of royalties recommended by Fall, and expressed in the lease of December 11, 1922. That lease was arranged by private negotiation, and no competition of any kind was had in the making of it and no other oil company was invited to submit a proposal for a lease, although at least one other oil company would have been interested in the matter. Some time prior to the making of that lease, and down to October, 1922, Fall and other officers and employés of the United States, who were in close touch with him in the administration of the naval petroleum reserves, stated to persons making inquiry for leases in the Naval Reserve No. 1 that it was not the intention of the Department of the Interior or of the United States to make any lease or to drill in Naval Reserve No. 1 except for purely defensive purposes, and that no immedi-

ate leasing or drilling was in contemplation. So far as Fall was concerned those representations were false and untrue and by him known so to be.

In February, 1922, an agreement was made by the United States with the Pacific Oil Company that no drilling should be done by either party except on six months' notice to the other party on certain lands in sections 27, 28, 29, 30, 31, and on all of sections 32 and 33 and the W. ½ of 34, Tp. 30 S., R. 24 E., and on portions of sections 3, 4, 5, and 6 in Tp. 31 S., R. 24 E., and in October, 1922, a similar agreement was made as to Sec. 31, Tp. 30 S., R. 24 E., and Sec. 36, Tp. 30 S., R. 23 E. Both agreements are still in force. There was no necessity, on account of threatened drainage, to make the lease of December 11, 1922, at the time when it was made. At that time the plans for construction work at Pearl Harbor had not been prepared, nor were they prepared until January 7, 1922. The contract of April 25, 1922, is a contract for the construction of a reserve fuel depot at Pearl Harbor and filling the same with fuel oil. The contract of December 11, 1922, contains an agreement for the erection of two reserve fuel depots for the navy at Pearl Harbor and filling the same with certain petroleum products.

At the time when Doheny paid Fall the $100,000, it was understood by him and Fall that the latter need not repay said sum or any part thereof to Doheny. Doheny expected that, if Fall did not sell or turn over certain ranch land owned by him or to be acquired by him in New Mexico, Doheny would cause the transport company to employ Fall at a salary sufficiently large to enable him, out of one-half thereof, to pay off said amount in five or six years. At the time of the said payment to Fall, Doheny knew that Fall expected to leave the service of the government and to accept employment with one of his companies or both, through his (Doheny's) procurement. Doheny and Fall acted in co-operation and collusion with respect to the royalties being paid and to be paid on subsequent leases by the defendant corporations, and the royalties stipulated in the leases were fixed, arranged, and settled by Fall and Doheny.

By the contracts of April 25, 1922, and December 11, 1922, the Secretary of the Navy surrendered and delegated to the Secretary of the Interior vital, essential, and discretionary rights, powers, and duties which by the Congress of the United States were conferred exclusively and solely upon the Secretary of the Navy.

There have been constructed and completed, under the direction of the defendants at Pearl Harbor, all of the fuel oil storage facilities mentioned in the agreement of April 25, 1922, and there have been constructed and completed under the direction of the defendants much of the additional storage facilities for crude oil products mentioned in the agreement of December 11, 1922, and such projects and property are of benefit and value to the United States, and have been constructed economically and without waste or extravagance, and are now available for use by the United States, and are on property of the United States at Pearl Harbor, and the money expended for the construction thereof has been expended by the defendants upon the property of the United States and under the supervision and inspection of duly appointed officers of the navy, and said property, so constructed upon the property of the United States, should be retained and kept thereon.

At the time of the conclusion of the trial, all the additional storage facilities for crude oil products required by the agreement of December 11, 1922, had been completed, and there had been delivered into the possession of the United States at Pearl Harbor and into said storage facilities 1,453,274.94 barrels of fuel oil of the quality required by the agreement, and the same was accepted by the United States, and is retained by it, and is of value and benefit to the United States equal to the cost of furnishing and transporting the same. The court further found that the lessee, in compliance with the terms of the leases of June 5 and December 11, 1922, did expend sums of money in exploration, exploitation, and development of the lands referred to therein, and in producing and maintaining production of oil, gas, and gasoline therefrom, and in making permanent improvements and facilities upon said lands necessary to comply with the terms of said leases, and said expenditures were made economically and without waste, and with the knowledge and under the general supervision of duly appointed officials of the United States, and the result of said expenditures is and will be of benefit and value to the United States equal to the amount thereof.

From all of said findings of fact, the court drew the following conclusions of law: That the payment of $100,000 by Doheny to Fall was contra bonos mores and against public policy; that it is immaterial whether

the directors and stockholders of the transport company knew of said payment; that the making of said payment constitutes a fraud upon the United States, and renders voidable all contracts and transactions made subsequent thereto between said corporation or its codefendant and the United States; that Doheny and Fall conspired and confederated for the making of certain contracts and agreements of great benefit and advantage to the transport company, to wit, the contract of April 25, 1922, Exhibit B of the complaint, the contract of April 25, 1922, Exhibit E, the lease of June 5, 1922, the contract of December 11, 1922, and the lease of December 11, 1922; that the contract of April 25, 1922, Exhibit B, was not let upon competitive bidding; that that contract and the contract of December 11, 1922, Exhibit C, the lease of June 5, 1922, and the lease of December 11, 1922, are voidable at the option of the United States, and should be delivered up to be canceled; that the contract of April 25, 1922, Exhibit B, and the contract of December 11, 1922, are null and void and of no effect, because they constitute unlawful delegation of authority to the Secretary of the Interior, contrary to the terms and provisions of the Act of June 4, 1920, and they should be surrendered for cancellation; that the executive order of May 31, 1921, is, in so far as it attempts to transfer the discretionary power of the Secretary of the Navy to the Secretary of the Interior, ineffectual and in excess of the executive power of the President; that the lease of June 5, 1922, was part of the consideration of an illegal contract, to wit, the contract of April 25, 1922, Exhibit B, and the same should be delivered up for cancellation; that the lease of December 11, 1922, constituted part of the consideration given by the United States for the contract of December 11, 1922, which contract being wholly void and illegal, the said lease also is void and illegal and should be delivered up for cancellation; that the defendants should cease to trespass upon the lands of the United States and forthwith surrender possession thereof and be enjoined and restrained from further operations or activities of any kind on said lands and from removing any materials, tools, machinery, etc., therefrom.

In view of the equities between the parties, the trial court concluded that the defendants should be paid for and allowed credit for moneys actually expended in the construction of the storage facilities at Pearl Harbor, and that a complete account should be taken between the plaintiff and the defendants to determine the total and gross amount of oil petroleum products the defendants have taken from the lands covered by the lease of June 5, 1922, and the lease of December 11, 1922, and the money value of such products so taken, and, upon ascertaining the total gross quantity of such products and of the pecuniary value thereof, such sum to be found due; if any, upon such accounting, should be paid by the defendants to the plaintiff, and that in such accounting the defendants be entitled to be credited with the cost price of the storage facilities so completed and installed at Pearl Harbor, together with the cost price of fuel oil contents placed therein and the actual expenditures of money in drilling and putting on production in wells drilled under the leases of June 5, 1922, and December 11, 1922, and that the costs of the suit should be paid by the defendants.

The defendants take their appeal from that portion of the decree which awards the plaintiff equitable relief. The plaintiff takes its cross-appeal from that portion of the decree which awards the defendants credit for moneys expended under the contracts and leases, and directs an accounting.

Frederic R. Kellogg, of New York City, Joseph J. Cotter, of Washington, D. C., Dean Emery, of New York City, Harold Walker, of Washington, D. C., Charles Wellborn, Olin Wellborn, Jr., Henry W. O'Melveny, and Walter K. Tuller, all of Los Angeles, Cal., and Frank J. Hogan, of Washington, D. C., for appellants and cross-appellees.

Atlee Pomerene, of Cleveland, Ohio, and Owen J. Roberts, Sp. Counsel, of Philadelphia, Pa., and Samuel W. McNabb, U. S. Atty., of Los Angeles, Cal., for the United States.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The defendants assign error to certain of the findings of fact of the trial court, certain of the rulings of that court upon the admission of evidence, and certain of the court's conclusions of law. We find no ground for disturbing the findings of fact which we deem essential to the decision of the case, and, while the evidence may be insufficient to support certain contested findings, the disputed facts, in view of our conclusions upon the law applicable to the case, become of little importance.

[1]. Particular objection is made to the ad-

mission in evidence of statements made by Doheny before the Senate Committee. Those statements were offered in evidence after Doheny had been called as a witness for the plaintiff to testify as to the $100,000 payment to Fall by him, and had availed himself of his constitutional privilege by declining to answer on the ground that his testimony might tend to incriminate him. The offer in evidence of the statements so made before the Senate Committee was accompanied with a proffer of proof that Doheny had voluntarily appeared and made the statements before the committee. Objection was interposed, on the ground that the said statements were not shown to have been made as part of any transaction of the defendant corporations, or as part of the res gestæ of any corporate transaction, or under circumstances showing that Doheny had any express or implied authority to appear before the Senate Committee and speak for said corporations. The court held that, at the time of making the declarations, Doheny was acting within the scope of his authority as an agent of his corporations and admitted the testimony. There having been a preliminary showing before the court that the leases were negotiated by Doheny on behalf of the defendants, and as their agent and that those matters were the very matters brought for investigation before the Senate Committee, we are not convinced that the court's ruling was erroneous.

There can be no question but that the declarations of an officer or agent of a corporation, even though they consist of a narrative of past facts, may, under appropriate circumstances, be admitted in evidence against the corporation, nor does the admissibility of such declarations necessarily depend upon the length of time that has elapsed between the occurrences and the declarations, 10 R. C. L. 978. Clearly if any officer of the defendant corporations was authorized to bind them by declarations after the event, it was Doheny. As president of both companies, he had negotiated the agreements and had executed the same. The scheme to pay for tankage facilities construction and fuel oil by government royalty oil originated with him and Fall. He was the dominating figure and the administrative officer by whom the business of the corporations was conducted, and acts done by him within the scope of the corporate powers were presumably duly authorized. At the time when the declarations were made, there were pending transactions between the plaintiff and the defendants

to which the declarations were pertinent, for the contracts and leases were in active operation, and their validity was being investigated by the Senate Committee. The defendants were interested in vindicating the contracts, and it was to their interest to show that the $100,000 transaction was a purely personal one, and in no way related to the procurement of the contracts. The declarations were also against the interest of the declarant, and no other means of obtaining the evidence were available to the plaintiff. Among the cases tending to support the ruling of the trial court are Chicago v. Greer, 9 Wall. 726, 19 L. Ed. 769; Xenia Bank v. Stewart, 114 U. S. 224, 5 S. Ct. 845, 29 L. Ed. 101; Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 S. Ct. 833, 46 L. Ed. 1193; Joslyn v. Cadillac Automobile Co., 177 F. 863, 101 C. C. A. 77; C., B. & Q. R. R. Co. v. Coleman, 18 Ill. 298, 68 Am. Dec. 544. In Rosenberger v. H. E. Wilcox M. Co., 145 Minn. 408, 177 N. W. 625, the court said:

"The fact that this transaction occurred some time after the contract of sale of the stock, and that the statement was an admission as to facts existing when the contract was made, is not decisive. An agent of a corporation, if acting within the scope of his authority, may make an admission in behalf of the corporation as to a past transaction, just as a natural person or his authorized agent may do so."

[2] It is contended that the Act of June 4, 1920 (41 Stat. 812), conferred upon the Secretary of the Navy ample authority to enter into the exchange contracts of April and December, 1922. We cannot think that by the use of the word "exchange" in the act, which was a rider to the appropriation bill of June 4, 1920, it was the intention of Congress to bestow upon the Secretary of the Navy power to dispose of the oil products of the naval reserves in the manner in which it was done in the contracts and leases here in question. The act, after giving the secretary possession of the naval reserve lands, etc., authorized him "to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands within the naval reserves, for the benefit of the United States. * * * Provided further, that such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed

$500,000, are hereby made available for this purpose until July 1, 1922." Section 1 (Comp. St. Ann. Supp. 1923, § 2804i).

The power to lease, following as it does the authority to conserve, was evidently to be used as a protective measure to prevent drainage of the naval reserve lands from adjacent oil drilling. The power to sell, so conferred, necessarily carried with it the legal obligation to turn into the Treasury of the United States the proceeds of sales. If anywhere in the act there is authority to justify the execution of the contracts and leases in question here, it must be found in the word "exchange." The opinion of the Judge Advocate General of the Navy was that the authority thus granted to exchange was "unrestricted," which could only mean that the Secretary of the Navy could exchange all oil in the naval reserve and all royalty oils for any purpose for which he saw fit. The defendants do not go so far as that. They assume that the authority to exchange is limited to exchanges for fuel reserve purposes. We find nothing in the act which imposes such a limitation, and we think it clear that the word "exchange" embraces either the broad authority which was found by the Judge Advocate General, or that the intention was to limit the exchange by the words of the accompanying proviso "not exceeding $500,000," and that the exchange intended was an exchange of crude oil for fuel oil for the current use of the navy; the then existing depots of fuel oil for current use having been authorized by express acts of Congress. The Act of June 4, 1920, bestows no express authority to create fuel depots. If the power to exchange be extended beyond exchange for current fuel oil or facilities for the storage of royalty oils not to exceed $500,000, there is no limit to it. There can be no middle ground. Either the intention was that the power was thus to be limited, or it was absolutely without limit, and under it the Secretary of the Navy might have exchanged crude oil for battleships or airplanes, or anything else which he deemed to be of benefit to the navy, and all this in addition to the millions contracted to be expended for the storage facilities at Pearl Harbor and the filling of the same, the total estimate for which, according to the testimony of Admiral Robison, was $103,000,000.

As early as August 31, 1842, Congress, under its constitutional authority to provide and maintain a navy, enacted that "the Secretary of the Navy may establish, in such places as he may deem necessary, suitable depots of coal, and other fuel, for the supply of steamships of war." Rev. Stat. § 1552. On March 4, 1913, 37 Stats. 898, on account of the establishment of fuel depots by the Secretary of the Navy, which had subsequently been abandoned, Congress, on the recommendation of the House Committee on Naval Affairs, "in the interest of economy," repealed section 1552, R. S., and at the same time made an appropriation for the completion of a coaling plant and oil tanks at Pearl Harbor. Thereafter annual appropriations were made for fuel oil storage at various points; the largest appropriation for that purpose being $200,000. For the year 1921 an appropriation of $1,000,000 for storing oil at Pearl Harbor was requested by the Chief of the Bureau of Yards and Docks of the Navy, but the request was denied, and no appropriation for that purpose was made for that year; nor was any made for any subsequent year, obviously for the reason that none was applied for.

It is not conceivable that by the rider to the appropriation bill Congress intended in that casual way to surrender its legislative functions as to the control and disposition of the naval oil reserves and the establishment of fuel oil depots for the navy, to revolutionize the established method of transacting the public business of the United States, and to repeal, so far as they relate to the oil reserves, sections 3732 and 3733, Rev. Stat., and sections 6884, 6885, 6886 and 6873, Comp. St., which forbid the making of contracts to bind the government beyond the amount appropriated therefor, unless otherwise specifically provided, 'and section 3709, Rev. Stat., being Comp. St. § 6832, which makes competitive bidding and advertising indispensable to the making of all such contracts, and sections 3617 and 3618 of Rev. Stat., being Comp. St. §§ 6606, 6609, which make it obligatory to turn into the Treasury of the United States all proceeds of sales of royalty oils as was done prior to June 4, 1920, and as was expressly provided by the Act of February 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss). If such had been the intention, it is but reasonable to assume that it would have been expressed in terms so clear as to exclude all doubt.

[3] The construction placed upon the act by the officers of the government, to whom were delegated the powers conferred thereby, is of no value as indicating the meaning of the act. The evidence is that the Secretary of the Interior and the representatives of the

Department of the Navy, who were most interested and active in furthering the Pearl Harbor scheme, were doubtful of their authority to engage in it, and intentionally refrained from giving out information concerning the same, and withheld from members of Congress knowledge of their action, through fear that they would encounter trouble from Congress. Clearly any such contract is illegal, unless made in pursuance of authority previously given by Congress. It is no answer to these considerations to say that the contracts were beneficial, and that the United States received full value for every dollar expended thereunder. Said the court in Filor v. United States, 9 Wall. (76 U. S.) 45, 19 L. Ed. 549:

"The officers at Key West did not represent the United States, except in their military capacity, though assuming to do so. In signing the agreement, and in taking possession of the premises claimed by the petitioners, they acted on their own responsibility. Their unauthorized acts cannot estop the government from insisting upon their invalidity, however beneficial they may have proved to the United States. If the petitioners are entitled to compensation for the use of the property they must seek it from Congress."

[4] The defendants, referring to the fact that the record contains no finding that the contracts or leases were harmful, or that the government was damaged thereby, contend that the suit may not be maintained without proof of pecuniary damage to the United States. To that we cannot agree. As indicating pecuniary damage, the trial court directed attention to the fact that the government had for a period of fifteen years parted with possession of the oil and petroleum products of its naval oil reserves, and had been deprived of its right to make more valuable contracts and leases than those which were made with the defendants, and to obtain the benefits of competition for leases, and, passing by those considerations as not necessarily pertinent to the case, the court based its decree upon the right of the United States to be restored to the use and possession of its naval oil reserves, which, through fraud, undue favoritism, and misconduct of its officers, had been relinquished to private enterprises. We think the ground so taken by the trial court was justified. Applicable to this question are the authorities cited later in this opinion on the question of the obligation of the United States to accord the defendants equity. In Heckman v. United States, 224 U. S. 413, 439, 32 S. Ct. 424,

432 (56 L. Ed., 820), upon the right of the United States to invoke the equity jurisdiction of its courts, the court said: "It was not essential that it should have a pecuniary interest in the controversy." In United States v. Carter, 217 U. S. 286, 30 S. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594, it was held that the fact that the United States had suffered no pecuniary damage from a fraud committed against it did not prevent recovery. In Hammerschmidt v. United States, 265 U. S. 182, 188, 44 S. Ct. 511, 512 (68 L. Ed. 968) the Chief Justice said:

"To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention."

[5-7] We are unable to affirm the court below in holding that the United States, in order to obtain the relief which it sought, is required to credit the defendants with the sums which they expended under the leases and contracts, and in holding applicable to the case the maxim that he who seeks equity must do equity. That maxim is as old as equity itself, and is of almost universal application. It means that he who seeks the aid of an equitable court subjects himself to the imposition of such terms as the settled principles of equity require. But the maxim is only a guiding principle and not an exact rule governing all cases. Hanson v. Keating, 8 Jur. 949. In that case the Vice Chancellor said:

"It is a rule which per se can by no possibility decide what the rights of the defendant are. It only raises the question what equity, if any, the defendant has against the plaintiff in the circumstances of the case to which the rule is sought to be applied."

And it is held that the maxim is restricted to cases where the plaintiff is wholly without remedy at law, and is entirely dependent upon a suit in equity for relief. Gilliat v. Lynch, 2 Leigh. (29 Va.) 493; Scott v. Scott, 18 Grat. (59 Va.) 150; Dranga v. Rowe, 127 Cal. 506, 59 P. 944. Here the plaintiff had a remedy at law, but resorted to equity to avoid a multiplicity of suits. It is well settled also that the maxim is not applicable in the case of a suit by the United States to

vindicate its dominion over the public lands and to avail itself of substantial rights under statutory provisions. In United States v. Trinidad Coal Co., 137 U. S. 160, 170, 11 S. Ct. 57, 61 (34 L. Ed. 640) Mr. Justice Harlan said:

"If the defendant is entitled, upon a cancellation of the patents fraudulently and illegally obtained from the United States, in the name of others, for its benefit, to a return of the moneys furnished to its agents in order to procure such patents, we must assume that Congress will make an appropriation for that purpose, when it becomes necessary to do so. The proposition that the defendant, having violated a public statute in obtaining public lands that were dedicated to other purposes, cannot be required to surrender them until it has been reimbursed the amount expended by it in procuring the legal title, is not within the reason of the ordinary rule that one who seeks equity must do equity; and, if sustained, would interfere with the prompt and efficient administration of the public domain."

In Heckman v. United States, 224 U. S. 413, 447, 32 S. Ct. 424, 435 (56 L. Ed. 820), Mr. Justice Hughes, answering the contention that there should be equitable restoration before enforcement of the law in a case involving the violation of statutory restrictions on the alienation of Indian lands, said:

"The effectiveness of the acts of Congress is not thus to be destroyed. The restrictions were set forth in public laws, and were matters of general knowledge. Those who dealt with the Indians contrary to these provisions are not entitled to insist that they should keep the land if the purchase price is not repaid, and thus frustrate the policy of the statute."

In Causey v. United States, 240 U. S. 399, 402, 36 S. Ct. 365, 367 (60 L. Ed. 711), Mr. Justice Van Devanter, after observing that the public lands are held in trust for all the people, and that, in providing for their disposal, Congress has sought to advance the interests of the whole country by opening them to entry under restrictions, said:

"And when a suit is brought to annul a patent obtained in violation of these restrictions, the purpose is not merely to regain the title, but also to enforce a public statute and maintain the policy underlying it. Such a suit is not within the reason of the ordinary rule that a vendor suing to annul a sale fraudulently induced must offer and be ready to return the consideration received. That rule, if applied, would tend to frustrate the policy of the public land laws; and so it is held that the wrongdoer must restore the title unlawfully obtained and abide the judgment of Congress as to whether the consideration paid shall be refunded."

In line with the foregoing decisions are Washington Sec. Co. v. United States, 234 U. S. 76, 34 S. Ct. 725, 58 L. Ed. 1220, United States v. Poland, 251 U. S. 221, 40 S. Ct. 127, 64 L. Ed. 236, and Diamond Coke & Coal Co. v. Payne, 271 F. 362, 50 App. D. C. 288.

To the proposition that the equitable claims of the government appeal to the conscience of a chancellor with no greater force than do those of private citizens under like circumstances, the defendants cite, among other cases, United States v. Stinson, 197 U. S. 200, 25 S. Ct. 426, 49 L. Ed. 724, and United States v. The Thekla, 266 U. S. 328, 45 S. Ct. 112, 69 L. Ed. 313. In the first of these cases, a suit was brought by the United States to set aside patents alleged to have been fraudulently acquired. The decision was that in such a suit the government is subjected to the same rules as is an individual respecting the burden of proof, quantity and character of evidence, and presumptions of law and fact, and that in a case of that kind equity will protect the rights of an innocent purchaser for value and without notice. In the second case, a libel had been filed by the owners of the Luckenbach against the bark Thekla for damages resulting from a collision. The owners of the bark filed a cross-libel. The United States became a party libelant as owner pro hac vice of the Luckenbach, and made claim thereto, and filed a stipulation to pay any amount awarded against that vessel by the final decree. Concerning the effect of the claim and the stipulation, the Supreme Court said:

"When the United States comes into court to assert a claim, it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject-matter. The absence of legal liability in a case where, but for its sovereignty, it would be liable, does not destroy the justice of the claim against it."

The propositions involved in those cases are not in dispute here. But the defendants cite also cases such as United States v. Debell, 227 F. 775, 142 C. C. A. 299, and United States v. Midway Northern Oil Co. (D. C.) 232 F. 619, which apply the equitable maxim to the United States when it resorts to equity in suits of the kind there involved. There can be no doubt that, where a patent

to public land has been acquired by fraud, and the patentee has conveyed the land to an innocent purchaser for value, the remedy of the United States is to resort to a suit in equity to set aside the patent, the patent having been issued in due and proper form and under authority of law as attested by the action of the officials of the Land Office. In so doing the government, being required to seek equitable relief, must, as incident thereto, deal equitably with defendants, who in good faith have acquired title from the patentee, and there can be no doubt that in a suit brought by the United States for accounting against trespassers who entered upon public lands in good faith, through a mistake of law, and in the belief that they could acquire title under the mineral laws, the plaintiff will be required to do equity. But, in the present case, although the suit is in form a suit to cancel leases of the public domain, the United States is not seeking equity. It is but fulfilling its duty to protect the public domain and to compel compliance with fundamental laws of the United States. To do what the defendants here claim to be equity would be to require the court to exercise functions which belong to the legislative branch of the government, to legalize demands founded upon violations of the laws of the United States, and to make judicial disposition of the public resources of the United States.

To hold in the present case that the defendants have equities which demand the protection of the court would be to ignore the fundamental distinction between cases brought to determine rights as between the United States and citizens depending upon contracts made under the authority of the laws of the United States and cases in which the contracts have been made without authority of law or in violation thereof. In The Floyd Acceptances, 7 Wall. (74 U. S.) 666, 680 (19 L. Ed. 169), it was said:

"Our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law." That doctrine is exemplified in numerous decisions. Whiteside v. United States, 93 U. S. 247, 23 L. Ed. 882; Hooe v. United States, 218 U. S. 322, 31 S. Ct. 85, 54 L. Ed. 1055; Chase v. United States, 155 U. S. 489, 15 S. Ct. 174, 39 L. Ed. 234; Sutton v. United States, 256 U. S. 575, 41 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403.

Credit for moneys expended by the petroleum company in drilling and operating oil wells and making improvements on Naval Reserve No. 1 could be allowed only on the theory that said corporation committed innocent trespass upon the naval reserve and in good faith expended said money and made said improvements. The mala fides of the trespasses, however, follows from the findings of the court below. That such credits could lawfully be decreed only in a case where the trespass upon the lands was innocently made in good faith is well established. Pine River Logging Co. v. United States, 186 U. S. 279, 22 S. Ct. 920, 46 L. Ed. 1164; Wooden Ware Co. v. United States, 106 U. S. 432, 1 S. Ct. 398, 27 L. Ed. 230; Union Naval Stores v. United States, 240 U. S. 284, 36 S. Ct. 308, 60 L. Ed. 644.

The decree of the court below, so far as it awards affirmative relief to the United States in ordering the cancellation of the leases and contracts, and commands the defendants to surrender possession of the lands mentioned in the bill of complaint, and enjoins them against trespassing thereon or removing property therefrom, is affirmed. That portion of the decree which directs that the defendants be credited with the cost price of the storage facilities for crude oil products at Pearl Harbor and the cost price of the fuel oil contents thereof and the actual expenditures of money in drilling and putting on production any wells drilled under the leases is reversed, and the cause is remanded to the court below for further proceedings in accordance with the foregoing opinion.